# STATE *vs*. MYRON R. KENT.

Opinion filed March 20th, 1895.

### Prejudice of Judge—"May" Construed as "Must."

When a person on trial for felony presents to the judge of the district in which the indictment is pending his affidavit stating that he cannot have an impartial trial, by reason of the *bias* and prejudice of such judge, it is the absolute duty of such judge to call in another judge to try the case. For him to refuse to do so is error. The word "may," in the statute (§ 7312, Comp. Laws,) must be construed as "must," under a familiar rule of construction.

### Nonresident Attorney Assisting Prosecution.

It is not error for the trial judge to permit an attorney who is neither a resident nor a member of the bar of this state, but is a nonresident of this state, and who is employed solely by relatives of the person for whose murder the accused is being tried, to assist the prosecuting attorney on the trial, the latter having requested the judge that such counsel be permitted to aid him in the case.

### One Who Directs a Murder is Principal.

Under § 7260, Comp. Laws, it is proper to charge as principal in the homicide one who counsels and directs a murder, and who therefore would have been an accessory before the fact at common law. The information or indictment may aver that he himself fired the fatal shot, which was in fact fired by the one he instigated to commit the crime.

### Latitude of Cross-examination—Accomplice.

Great latitude should be allowed in the cross-examination of an accomplice. Hence, it was error for the court to refuse to allow counsel for the accused to ask the accomplice, who had, by his own testimony, made out a case of murder against himself, whether he expected to be hung.

### Credibility of Accomplice—Inquiry as to Prosecution.

*Held*, further, that it was error to refuse to permit counsel for the accused to prove, as bearing upon the credibility of the accomplice, that no proceedings whatever had been instituted against him for the murder he had confessedly committed, although several months had elapsed since he had confessed his connection with the crime.

### Corroboration of Accomplice.

In this state, no person can be convicted on the uncorroborated testimony of an accomplice. Comp. Laws, § 7384. The corroboration must come from some source independent of the accomplice. But it is not necessary that the corroborating evidence should be sufficient in itself to support a conviction. It is enough of it tends to connect the accused with the commission of the offense.

It must, however, tend to connect the accused with the commission of the crime. Evidence corroborating the accomplice as to the fact that a crime has been committed, or with respect to the fact that the accomplice is guilty thereof, will not satisfy the requirements of the statutes.

### Evidence of Written Instructions to Accomplice.

Instructions given by the accused to the accomplice touching the story the latter was to tell in explanation of the killing may be sworn to by the accomplice; and it is not error for the court to receive in evidence a book in which such instructions were written down by the accomplice, when the latter swears he wrote them down as they were given to him by the accused, and under his direction.

### Witness May Translate His Own Memoranda of Instructions.

Nor was it error for the court to allow the accomplice, who was a Bohemian, to translate into English these written instructtons, which he himself had written in the book in the Bohemian dialect, he having testified to his ability to make the translation correctly.

Error to District Court, Morton County; *Winchester*, J.

Myron R. Kent, having been convicted of murder, brings error. Reversed.

*M. A. Hildreth, J. E. Campbell* and *J. G. Perrault*, for plaintiff in error.

The word "may" as used in the last clause of § 7312, Comp. Laws, is mandatory. *State v. Henning*, 54 N. W. Rep. 536; *State v. Palmer*, 57 N. W. Rep. 490; *Goldsby v. State*, 18 Ind. 147; *Merhan v. State*, 44 Ind. 598; *Manley v. State*, 52 Ind. 215; *Dinginnis v. State*, 66 Ind. 350; *State v. Nerumn*, 49 Conn. 233; *Kane v. Forth*, 70 Ill. 587; *Com. v. Smith*, 111 Mass. 407; Potters Dwarris on Stats. 220; Endlich on Int. of Stats. 416. Permitting F. M. Nye to appear as private prosecutor with the states attorney was illegal. 1 Bish. Cr. Pro. § 988; *Miester v. People*, 1 Am. Cr. Repts. 91; *State v. Russell*, 53 N. W. Rep. 441. The sheriff was a witness for the prosecution and the special venire issued to him should have been set aside on defendants motion. *Peo. v. Coyodo*, 40 Cal. 592; *Peo. v. Welsh*, 49 Cal. 174. Kent is charged with having killed deceased, the evidence showed that he only advised it. If there is a variance between the allegation and the proof, this is usually fatal. *Green v. State*, 1 Am. Cr.

Repts. 645; *Boyd* v. *Com.*, 4 Am. Cr. R. 145; *Peo.* v. *Durman*, 106 N. Y. 502; *State* v. *Vorey*, 43 N. W. Rep. 324; 1 Chitty Cr. L. 168, 171; *State* v. *Fallon*, 2 N. D. 510. It was necessary to charge Kent, with having advised, aided and abetted the commission of the homicide. *Peo.* v. *Swartz*, 32 Cal. 160; *Peo.* v. *Trim*, 39 Cal. 75; *Peo.* v. *Campbell*, 40 Cal. 129; *Com.* v. *Mulligan*, 8 Cr. L. Mag. 639; *Peo.* v. *Thrall*, 50 Cal. 415. Admission of improper evidence is reversible error, even though the other evidence in the case was sufficient to sustain a conviction. *Queen* v. *Gibson*, 7 Am. Cr. R. 171; *Somerville* v. *State*, 6 Tex. App. 433. Any statement of Swedensky, not a part of the criminal enterprise and made after the homicide was consummated was inadmissable. *Peo.* v. *Stone*, 13 Hun. 265; 3 Rice on Ev. 902. Before the acts and declarations of the confederate could be proved against Kent, it was necessary to prove *prima facie* that he Kent had conspired with this confederate to murder deceased. 1 Greenl. on Ev. 3; *Peo.* v. *Bennett*, 49 N. Y. 144. It was therefore error to permit Swedensky to testify as to the book and to translate it. *Armsby* v. *Peo.*, 53 N. Y. 472; *McKenzie* v. *State*, 25 S. W. Rep. 426; *Brown* v. *U. S.*, 150 U. S. 93; *State* v. *Green*, 18 S. E. Rep. 933; *State* v. *Beaucleigh*, 4 S. W. Rep. 666; *Wylie* v. *State*, 3 S. W. Rep. 570; *State* v. *Melrose*, 12 S. W. Rep. 250; *Peo.* v. *Pavlik*, 3 N. Y. Supp. 232; *Peo.* v. *Sharp*, 14 N. E. Rep. 319; *Lewis* v. *Com.*, 11 S. W. Rep. 444. It was competent to show that no steps had been taken looking to the prosecution of Swedensky. Abbott's Cl. Bf. 384; *Peo.* v. *Whipple*, 9 Cow. 708; *Peo.* v. *Langtree*, 64 Cal. 256.

*H. G. Voss* and (*John 'F. Cowan*, Atty Gen'l,) for defendant in error.

The word "may" as used in § 7312, Comp. Laws, means permissible only. *Territory* v. *Smith*, (Mss.;) *Gould* v. *Hahes*, 19 Ala; 492; *Turnpike Co.* v. *Miller*, 5 Johns Ch. 113; *Kane* v. *Fort*, 70 Ill. 582. It was proper for counsel to assist the states attorney in the prosecution. *Polin* v. *State*, 16 N. W. Rep. 898; *Bradshaw* v. *State*, 22 N. W. Rep. 363; *State* v. *Crafton*, 56 N. W. Rep. 257;

*State* v. *Shreves*, 47 N. W. Rep. 899; *Com.* v. *Williams*, 2 Cush. 582; *Gardner* v. *State*, 26 At. Rep. 30; 5 Am. & Eng. Enc. Law, 718. One who at common law would be an accessory before the fact, must now be indicted, tried and punished as a principal, and no additional facts need be alleged in any indictment against such accessory than are required in an indictment against his principal. *Peo.* v. *Blevin*, 112 N. Y. 79; *Campbell* v. *Com.*, 84 Pa. 187; *State* v. *Hessin*, 12 N. W. Rep. 77; *State* v. *Phelps*, 59 N. W. Rep. 471; *Peo.* v. *Rozelle*, 20 Pac. Rep. 36; *State* v. *Duncan*, 35 Pac. Rep. 117; *Peo.* v. *Anteveras*, 48 Cal. 19.

CORLISS, J. The plaintiff in error was convicted of the crime of murder. The jury, under the statute, decided that he should suffer death. Comp. Laws, § 6449. Having been sentenced to be hung, he obtained a writ of error, and the whole case is now before us for review.

The first point we will consider relates to the information. In it the accused is charged as principal. The information alleges that he himself held and discharged the gun by which the victim was killed. It contains no averment that he counseled and directed any third person to commit the crime. The undisputed fact is that the murdered person, who was Kent's own wife, was shot and killed by another, and that Kent's connection with the homicide, if any, was as the instigator of the accomplice. At the time the fatal shot was fired, Kent was many miles away. At common law, Kent would have been an accessory before the fact. He could not legally have been indicted as principal. Under such an indictment he could not, at common law, be convicted. This rule, however, was purely technical, and was limited in its scope to felonies. In cases of misdemeanors all the guilty persons were, at common law, principals,—as well those who counseled and directed the crime as those who personally committed the offense. 1 Bish. Cr. Law, § § 681, 685, 686. There was a single exception to this rule in cases of felonies, in that there were no accessories in cases of high treason. An accessory after the fact could not be convicted in advance of the convic-

tion of the principal, and he could not be indicted as a principal. The specific facts showing his subsequent connection with the traitorous project must have been set forth in the indictment. Id. § 701. In misdemeanors and high treason the pleader was always at liberty to charge the accessory as principal in the indictment. It was, however, entirely proper to set forth that the accused had counseled or directed the commission of the crime by another, but this was not necessary. As the law regarded all who were implicated as principals, they might all be proceeded against as principals. Id. § § 681, 685. This distinction between misdemeanors and treason, on the one hand, and felonies, on the other, with respect to the allegations of the indictment and the necessity of first trying the actual principal, never had any substantial foundation in principle. Id. § 673. There is, therefore, no reason why we should hestitate in giving to our statute, to which we will now refer, a construction which will place felonies in the same category with misdemeanors and treason, as far as these questions are concerned. The statute provides that "the distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abrogated; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, and no additional facts need be alleged in any indictment against such an accessory than are required in an indictment against his principal." Comp. Laws, § 7260. The language of this statute is too explicit to leave room for doubt as to the intent of the law-making power. The purpose it was framed and passed to accomplish was the abrogation of this purely arbitrary distinction between felonies and other offenses, and the placing of all criminal as well as civil pleading under the same general rule, which, regarding the act of the agent as the act of the principal himself, permits the averment to be made against him that he himself did what in fact was done by his agent for him. See 1

Bish. Cr. Law, § 673. The authorities are numerous which hold that under the same or similar statutes the one who would at common law be a mere accessory before the fact may be indicted as principal, as though he himself fired the shot, or administered the poison, or struck the fatal blow. Some of the statutes which have been so construed are by no means so explicit in their language as section 7260. *Hronek* v. *People*, 134 Ill. 139, 24 N. E. 861; *People* v. *Bliven*, 112 N. Y. 79, 19 N. E. 638; *Baxter* v. *People*, 3 Gilman, 368; *Dempsey* v. *People*, 47 Ill. 323; *Spies* v. *People*, (Ill. Sup.) 12 N. E. 865–915; *People* v. *Outeveras*, 48 Cal. 19; *State* v. *Hessian*, (Iowa,) 12 N. W. 77; *State* v. *Duncan*, (Wash.) 35 Pac. 117; *People* v. *Rozelle*, (Cal.) 20 Pac. 36; *Griffith* v. *State*, 90 Ala. 583, 8 South. 812. See, also, *State* v. *Phelps*, (S. D.) 59 N. W. 471.

This section, it is urged, is unconstitutional. We discover no provision of our constitution which it violates. Our organic law does not require that the accused shall be informed of the nature and cause of the accusation. The federal constitution does. Article 6 of the amendment to the constitution. But this provision of the constitution of the United States does not relate to proceedings in the state courts. Cooley, Const. Lim. (5th Ed.) p. 26. We are referred to § § 7241, 7242, Comp. Laws, as being repugnant to 7260. If they were repugnant they would, to that extent, have to yield to the latter section. But we are unable to find in these two sections anything which forbids the indicting of an accessory as if he were principal. Under them it would be proper to charge an accessory before the fact, in the case of a misdemeanor, as though he were principal, had section 7260 never been enacted. This latter section merely places felonies in the same class. Section 7241 declares that the indictment must contain "a statement of the acts constituting the offense in ordinary and concise language and in such manner as to enable a person of common understanding to know what is intended." What are the acts constituting the offense? They are the shooting of the deceased with a gun, with the premeditated design to affect her death, and the killing of her by such instrumentality, used with

such a motive. Counseling and directing this criminal enterprise is not a part of the crime itself. By proof of such counseling and direction, the plaintiff in error is so connected with the criminal act that, in contemplation of law, he himself, performed it. But the crime itself is entirely distinct from his connection with it. The killing of Mrs. Kent would have been murder, if Kent had never participated in it at all. He is charged with having himself performed these acts, and this charge can be made good by evidence that he counseled and directed the murder, because such conduct on his part makes him, in the eye of the law, a participant in the physical act of taking the human life, the same as if he had himself fired the fatal shot. The fact that he counsels and directs is an evidential fact, whose utmost scope is to establish that the accused was a principal in the crime. It in no manner tends to prove the crime itself. Evidential facts should never be pleaded, as a general rule. It is certainly not necessary to plead them. All the pleader need do is to aver the ultimate fact which the evidential fact may be proved to establish. That ultimate fact, in this case, was the connection of the accused with this murder, as a principal in the crime. That was pleaded, and could be proved by evidence that he fired the shot, or hired an assassin to fire it. Our statute imposes upon the criminal pleader no more onerous duty in framing an indictment than did the common law. And yet, with respect to treason and misdemeanors, it has always been regarded as proper pleading to aver that the accessory before the fact committed the crime himself. Such form of pleading has been universally considered as amply protecting the accused from surprise on the trial. Indeed, as we have seen, there was no reason why felonies should not have been included in the general rule. Our statute merely abrogates a distinction that had no foundation in reason. The argument that the accused will not be fairly apprised of the charge against him has been considered of no force, with respect to treason and misdemeanors, for centuries; and, indeed, as is asserted by the court in *People* v. *Bliven*, 112 N. Y. 79, 19 N. E. 638, and as is

satisfactorily established by the reasoning of the court in *State* v. *Duncan*, (Wash.) 35 Pac. 117, the argument is more "fanciful than real." We therefore hold that it was proper to charge Kent, in the information, as principal.

We now approach a very interesting question. The state's attorney was assisted on the trial by Mr. Nye,—a citizen of Minnesota, and a member of the bar of that state. He was retained by the brothers of the murdered woman to assist in the prosecution. He stated to the trial judge that while he had been paid nothing by his clients, and had had no talk with them on the subject of fees, he presumed that they would compensate him for his services in the case. He was not employed by the County of Morton, in which the crime was committed, or by the state's attorney of that county, to assist in the prosecution; but the latter stated in open court that he desired to have Mr. Nye assist him, for the reason that he (the state's attorney) was unable, because of physical ailments, to stand the labor and strain of the case, without aid. Mr. Nye was allowed, despite the objection of the counsel for the accused, to assist in the trial of the case, taking a very active part therein. Counsel for the accused insists that this was prejudicial error. There are two grounds on which he assails the action of the trial judge in permitting Mr. Nye to participate in the trial: *First*, that he was employed by private persons, and not by the public; *second*, that he was neither a resident nor a member of the bar of this state. We will discuss these two points in the order in which they are stated.

In England, criminal prosecutions were as a rule generally carried on by individuals interested in the punishment of the accused, and not by the public. The private prosecutor employed his own counsel, had the indictment framed and the case laid before the grand jury, and took charge of the trial before the petit jury. 1 Chit. Cr. Law, 9, 825. This system does not prevail in this state. Here, in each county, there is a public prosecutor, called the "state's attorney" for that county. It is his duty to prosecute all criminal offenses triable in that county. He is paid a salary for that

purpose out of the public funds. He is not allowed to receive any fee or reward from or on behalf of an prosecutor or other individual for services in any prosecution or business to which it is his official duty to attend, nor be concerned as attorney or counsel for either party other than for the state or the county, in any civil action depending on the same state of facts upon which any criminal prosecution commenced, but undetermined, shall depend. Section 427, 433, Comp. Laws. We do not think that this change in policy indicates a purpose to exclude the counsel for interested persons from all participation in the prosecution. Such counsel cannot initiate the proceedings, or conduct them. The control of criminal prosecution has been taken from private hands, and transferred to public functionaries chosen for that express purpose. But there is nothing in the statute to justify the conclusion that counsel employed by interested persons may not assist the public prosecutor, in case he and the trial judge deem this course proper. The fact that the state's attorney who controls criminal cases is not allowed to receive any compensation from private prosecutors for the prosecution of a criminal case does not warrant the conlcusion that no counsel paid by private persons shall be permitted to assist in the trial of such a case. It is one thing to have the prosecution entirely in the hands of one who may be influenced, because of a retainer, by the strong desire of his client to secure a conviction; but it is an entirely different thing to allow such an interested counsel to aid in the prosecution one who stands affected by no other motive than that of securing the punishment of guilt, and who has absolute control over the case. The law has removed criminal prosecutions from the control of private interests, but it has not excluded such interests from all participation therein. If no error is committed on the trial, we fail to see how an accused can be prejudiced by the fact that those personally interested have employed private counsel to aid the public prosecutor. Certainly, he should not be heard to complain of the zeal of the private counsel, if such counsel has not allowed his zeal to hurry him into error. The

best mode of reaching the truth is by the strenuous contentions of opposing counsel, each animated by the conviction that the cause he has espoused is just. The public have some interests at stake in a criminal prosecution. May all the zeal be displayed on one side, and none be tolerated on the other? The public interests demand that a prosecution should be conducted with energy and skill. While the prosecuting officer should see that no unfair advantage is taken of the accused, yet he is not a judicial officer. Those who are required to exercise judicial functions in the case are the judge and the jury. The public prosecutor is necessarily a partisan in the case. If he were compelled to proceed with the same circumspection as the judge and the jury, there would be an end to the conviction of criminals. Zeal in the prosecution of crimimal cases is therefore to be commended, and not condemned. It is the zeal of counsel in the court room, alone, of which the accused can complain. No decision can be found which questions the right of the prosecuting officer to consult with, and receive all manner of aid, even during the trial, from counsel for private parties, outside of the court room. And if such zeal in the court room, on the trial, does not result in error, what conceivable difference can it make whether such assistant was employed by the public, or by private persons? May not cross-examination of witnesses be conducted, and arguments to the court and jury be made, by one who is as much convinced of the guilt of the accused as his counsel is persuaded of his innocence? The manner of conducting the case in the court room cannot work legal prejudice to the accused, without resulting in error for which the conviction will be set aside. It is therefore of no legal importance what inspires the zeal of the attorney who assists in the trial. Whatever is done to the injury of the prisoner by private counsel, for which he can have no redress, is done out of court; for instance, by concealing or fabricating evidence. At just this point, where the zeal of counsel employed by private parties may be deadly to the accused, no kind of safeguard is or can be thrown around him. The prose-

cuting officer may consult with, and be entirely governed by the advice of, such private counsel; and yet the accused has no remedy, if the private counsel does not participate in the trial. If he does so participate, his zeal works no more prejudice to the accused than the zeal of any other equally able counsel who may be employed by the public. The cases all agree that an assistant hired by the public may engage in the trial without giving the prisoner any legal cause for complaint. Of course, the latter may think he is prejudiced because of being compelled to confront an exceptionally able and experienced prosecutor, but this furnishes no legal ground for overthrowing the conviction. The question can be placed in a clear light by the following statement of it: Can a defendant in a criminal case, who is obliged to submit to the zeal of an assistant prosecutor employed by the public insist that the zeal of an assistant counsel employed by interested parties, shall not be displayed against him, although it results in no error on the part of the prosecution in the management of the case? We think there is only one answer to this question, and that is against the right of the accused to complain in either case, so long as no error has been committed by the assistant on the trial. The rule is different, however, in Michigan and Massachusetts, under statutes very similar to ours. *Meister* v. *People*, 31 Mich. 99; *Sneed* v. *People*, 38 Mich. 251; *People* v. *Hurst*, 41 Mich. 328, 1 N. W. 1027; *People* v. *Bemis*, (Mich.) 16 N. W. 794; *Com.* v. *Gibbs*, 4 Gray, 146. The reasoning of Judge Campbell in *Meister* v. *People*, while very plausible, does not convince us that there should be interpolated into the statute an implied prohibition against counsel employed by interested parties assisting in the prosecution. We are enable to discover in the statute any other policy than that of transferring the control of criminial prosecutions from private to public hands. We think that the control of the public prosecutor over the proceedings is a sufficient guaranty that the accused will not be made the innocent victim of overzealous prosecution by private persons. While aware that Judge Campbell has made out a strong case in

support of his view, we cannot discover in the legislation of this state the evidence of a policy hostile to the quite general practice of allowing the prosecuting officer to be assisted by counsel retained by those having a personal interest in the prosecution distinct from that of the general public. In support of our ruling on this point, we cite the following cases: *State* v. *Helm*, (Iowa,) 61 N. W. 246; *Keyes* v. *State*, (Ind. Sup.) 23 N. E. 1097; *Polin* v. *State*, (Neb.) 16 N. W. 899; *State* v. *Bartlett*, 55 Me. 220; *State* v. *Fitzgerald*, 49 Iowa, 260; *State* v. *Wilson*, 24 Kan. 189; *Burkard* v. *State*, 18 Tex. App. 599–618; *Gardner* v. *State*, 55 N. J. 17, 26 Atl. 30; *Benningfield* v. *Com.*, (Ky.) 17 S. W. 271; *People* v. *Tidwell*, (Utah,) 12 Pac. 61; 1 Bish. Cr. Proc. § 281; Whart. Cr. Pl. & Prac. § 555. See, also, *People* v. *Powell*, (Cal.) 25 Pac. 481; *Jackson* v. *State*, (Wis.) 51 N. W. 89; *U. S.* v. *Hanway*, 2 Wall. Jr. 139, Fed. Cas. No. 15,299. See, particularly, the reasoning of Judge Elliott in *Keyes* v. *State*, (Ind. Sup.) 23 N. E. 1097, and Judge Brewer in *State* v. *Wilson*, 24 Kan. 189. The decision of the Wisconsin Supreme Court in *Biemel* v. *State*, 37 N. W. 249, sustaining the Michigan and Massachusetts doctrine, appears to be based upon legislation in that state authorizing the trial judge to appoint an assistant whenever he thinks the public interests require it, and providing that such assistant shall be paid out of the public funds. See pages 248 and 249. The case of *Lawrence* v. *State*, (Wis.) 7 N. W. 343, is distinguished in the Biemel Case on the ground that it was decided before the new statute was passed, giving the trial judge power to appoint an assistant to be paid out of the public treasury. The Lawrence Case is more in harmony with, than opposed to our views. We hold that it was not error to permit Mr. Nye to assist in the prosecution, at the request of the state's attorney, because of his having been employed by the brothers of the murdered woman.

Does the fact that he was not a member of the bar of this state render him an improper person to participate in a ciminal prosecution? This precise question was decided in favor of the contention of counsel for the accused in Wisconsin. *State* v. *Russell*,

(Wis.) 53 N. W. 441. But the decision was founded on the wording of the statute of that state authorizing the trial judge to appoint counsel to assist in the prosecution. The court held that the word "counsel" meant a member of the bar of that state. We have no such statute in this state. On the contrary, our legislation seems to voice a different policy. The act which regulates the admission of attorneys to practice provides that "any member of the bar of another state actually engaged in any case or matter pending in any court of this state may be permitted by such court to appear in and conduct such case or matter while retaining his residence in another state without being subject to the foregoing provision of this act." Laws 1891, Ch. 119, § 7. Our legislation, so far from being inimical to the employment of nonresident counsel to assist in criminal prosecutions, seems to place them on the same footing in this respect as resident attorneys. The statute, in express terms, dispenses with the necessity of the foreign counsel's taking any oath. Therefore, one of the main arguments against allowing a foreign attorney to assist the prosecution in a criminal trial, put forth by the court in the Russell Case, does not have any application in this state, with its policy, as shaped by legislation, of permitting foreign counsel to try cases without taking any oath. Whether such counsel does or does not take an oath is practically of little moment to the accused. Every attorney of high character is acting under the restraint of a more sacred oath than that which is formally administered to him in court,—the oath which, through his whole career, he constantly administers to himself in secret, before the solemn tribunal of his own conscience. A mere formal, liputtered oath will never control the conduct, unless it is the echo of an oath taken within. The fact that the foreign attorney is not amenable to the court before which he appears, as is a resident attorney cannot prejudice the rights of the accused. The trial judge can always, at any stage of the prosecution, refuse to permit him longer to remain in the case; and, if the judge considers that his conduct has been prejudicial

to the accused, he can always grant the accused a new trial. It is safe to leave these matters to the sound judgment of an impartial magistrate.

We come now to what we regard as a fatal error. Section 7312 of the Comp. Laws, provides as follows: "A criminal action, prosecuted by indictment, may, at any time before trial is begun, on the application of the defendant, be removed from the court in which it is pending, if the offense charged in the indictment be punishable with death, or imprisonment in the territorial prison, whenever it shall appear to the satisfaction of the court by affidavits, or if the court should so order by testimony, that a fair and impartial trial cannot be had in such county or subdivision, in which case the court may order the person accused to be tried in some near or adjoining county, in any district where a fair and impartial trial can be had; but the party accused shall be entitled to a removal of the action but once, and no more, and if the accused shall make an affidavit that he cannot have an impartial trial, by reason of bias or prejudice of the presiding Judge of the District Court where the indictment is pending, the judge of such court may call any other Judge of a District Court to preside at said trial, and do any other act with reference thereto, as though he was presiding Judge of said District Court." On the very threshold of the trial the counsel for the accused presented to the court an affidavit, sworn to by the accused, stating that he could not have a fair and impartial trial, by reason of the bias, prejudice, and partiality of Judge Winchester, who was the judge of the district in which the indictment was pending; and thereupon counsel for the accused moved, under the above quoted section of the statute, that Judge Winchester call in another Judge of the District Court to preside at the trial. This motion was denied. In so doing the learned trial court erred. The error is fundamental, and because of it we are obliged to reverse the conviction. It is true that the statute declares that the trial judge "may" call in another judge. But permissive language is often construed as mandatory. If a comprehensive survey of a

statute leads to the conclusion that the legislative purpose was to confer authority on one for the benefit of another, then the donee of such power has no discretion about exercising it. Said Chief Justice Dixon in *Cutler* v. *Howard*, 9 Wis. 309, at page 312; "The cases fully establish the doctrine that, when public corporations or officers are authorized to perform an act for others which benefit them, then the corporations or officers are bound to perform the act. The power is given to them, not for their own, but for the benefit of those in whose behalf they are called upon to act; and such is presumed to be the legislative intent. In such cases they have a claim *de jure* to the exercise of the power." Mr. Sutherland, in his work on Statutory Construction, at page 597, says that permissive words are "peremptory, when used to clothe a public officer with power to do an act which ought to be done for the sake of justice, or which concerns the public interest, or the rights of third persons." In *Supervisors* v. *U. S.*, 4 Wall. 435, the court says, at pages 446 and 447: "The conclusion to be deduced from the authorities is that where power is given to public officers in the language of the act before us, or in equivalent language, whenever the public interests or individual rights call for its exercise the language used, though permissive in form, is in effect peremptory. What they are empowered to do for a third person the law requires shall be done. The power is given, not for their benefit, but for his. It is placed with the depositary to meet the demands of right, and to prevent a failure of justice. It is given as a remedy to those entitled to its aid, and who would otherwise be remediless. In all cases it is held that the intent of the legislature, which is the test, was not to devolve a mere discretion, but to impose a positive and absolute duty." In the light of the rule which the foregoing authorities recognize,—a rule thoroughly settled,—we will proceed to construe the statute in question. For whose benefit was it enacted? Obviously, for the sole benefit of those accused of crime, that they might be protected against even the unconscious leaning of a biased judge in favor of the prosecution. By

expressions of countenance, by tone of voice, by gesture,—in a multitude of ways,—a prejudiced judge may unwittingly suffer his feeling against the prisoner to so express itself in conduct that the bias of the magistrate passes into the minds of the jury, thus depriving the accused of a fair trial before an impartial tribunal. When this prejudice exists the law intends that another judge shall try the case. It cannot admit of doubt that the act we are interpreting was passed to give the prisoner the right to insist on a trial before a different judge, when the judge of the district in which the indictment is pending is biased. From this proposition there flows the corollary that, on the presentation of an affidavit stating such bias, the right of the accused to have another judge called in to try the case is absolute. If not, then the judge who is so attacked for prejudice sits in judgment on the question of own bias. It is true that no property interests of his own are involved. Neither is his life or his liberty at stake. But the mind that cannot decide that it is biased without at the same time admitting by such decision that it was willing, in that condition, to enter on the trial of the man against whom the prejudice is entertained, without disclosing such bias, and that it would have carried on such trial to its close, conscious that it was not impartial,—a mind placed in a position where a decision against its own freedom from bias will bring it such humiliation,—is not that free, calm, disinterested mind, with respect to that question, which the law requires, and the honest administration of justice demands. This consideration renders it impossible for us to impute to the legislature the purpose to permit the judge so assailed to pass upon his own bias. The language of the statute confirms our view that he is not to try this question. This section contains two distinct provisions,—one relating to a change of venue on the ground that a fair and impartial trial cannot be had in the county in which the criminal action is pending, and the other referring to a change of judges because of the bias or prejudice of the judge of the court in which the indictment is pending. The question whether a fair and impartial trial cannot

be had in the county in which the action is triable must be settled by the judge. It must be made to appear to his satisfaction, by affidavit, that a fair and impartial trial cannot be had in that county. Having no interest in the question, the law very properly leaves it to him for decision. That he may decide it, the statute provides that affidavits may be used before him to prove or disprove this fact. The judge, in his discretion, may hear testimony on this subject. But, when we come to·that branch of the statute which relates to his own bias, nothing is said about his being satisfied of it, nor is there any provision made for the use on the application for a change of judges of any other affidavit than that of the accused, stating that, by reason of the bias and prejudice of the judge, he cannot have an impartial trial. Neither does the statute call for or permit the use of any other evidence than such affidavit. These considerations make it clear that the judge is not to try the question of his own bias. The accused need not prove it to "the satisfaction" of the judge. He is not even allowed to introduce evidence on that point, aside from his own affidavit. Although he might have a score of witnesses to whom the judge had stated his prejudice, he (the prisoner) is powerless to use on this application the testimony of one of them. These observations lead us inevitably to the following conclusions touching the rights, under this statute, of a defendant in a criminal action: When the judge of the court in which the indictment is pending is biased, the defendant may insist that another judge shall be called to try the case. The judge so attacked cannot try the question of his own bias. Unless, therefore, the right to a change of judges is absolute on making the statutory affidavit, the protection of this salutary law is lost to the defendant, and its enactment was an idle deed. The nature of the power vested in the trial judge to call in another judge to try the cause; the circumstances under which it is to be exercised; the fact that its exercise is beneficial to one accused of crime; the principle that no one shall decide a question in which he is

interested; and, finally, the very language of the statute itself, aside from the word "may,"—these all unite to bring this law within the scope of that established rule which transmutes the permissive word "may" into the imperative word "must." The Supreme Court of South Dakota has reached the same conclusion under the same statute. *State* v. *Henning*, 54 N. W. 536; *State* v. *Palmer*, 57 N. W. 490. A single sentence in the opinion of the court in *Hungerford* v. *Cushing*, 2 Wis. 292, will suffice to show that that decision turned on the language of a statute radically different from the one we are construing. Said the court: "It will be seen by a reference to the statute that the prejudice of the judge is classified with the other facts of the existence of some one of which the judge must be satisfied in order to justify him in changing the venue." We might pause here, as our conclusion on this point leads us to a reversal. But we deem it our duty to settle certain questions which are sure to arise on another trial, and some of which, we are of opinion, were erroneously decided by the trial court. The murder that was committed was so atrocious in its character that it is to be hoped that the accused, if again found guilty of instigating it, will not be in position to secure a third trial because of errors occurring on a second trial.

On the trial the theory of the prosecution was that the murdered woman was slain in pursuance of a conspiracy in which her husband, the accused, figured as the originator of the criminal scheme, and the instigator of the homicide, and a Bohemian named Swedensky played the part of a venal tool. This theory the testimony of the accomplice fully supported. He told the story of this conspiracy from the time that the accused first unfolded it to him, about a month before the murder, to its horrible consummation in the death of the unsuspecting wife. He testified that when Kent first broached the subject he refused to aid him, because of fear; but that Kent was persistent in his importunities, constantly dangling before the eyes of the Bohemian the wages he could earn by executing for Kent his fell purpose. The price Swendensky was to be paid for this deed was, according to

his testimony, the sum of $18,000. Finally, about four days before the fatal shot was fired, Swedensky says that he yielded; being assured by Kent that there was no danger, that he could claim that the shooting was accidental, and that after being in jail for a few days he would be liberated. To give the semblance of truth to his story that the killing was unintentional, he testified, in substance, that Kent told him what course to pursue. He was to awaken Mrs. Kent in the night, and tell her that there was some one outside the house, looking in the window. Kent stated to him that the boy (the son of the accused and the murdered woman, about 10 years of age) would think that he saw somebody around the house, that he would see some one in every window, and that he would be Swedensky's best witness that his story about burglars was true. He further instructed Swedensky that when Mrs. Kent, in going about the house, from room to room, endeavoring to see some one outdoors, should get in a certain position, he (Swedensky) was to shoot her in the head, and be sure to kill her. He was to tell people that there were burglars around the house, and that Mrs. Kent had told him to get the gun and shoot through the window; that the gun went off accidentally, and in that way he shot her. Swedensky further testified that Kent dictated to him a story to tell before the coroner's jury; that he wrote it down in a book, as Kent told him what to write. On the trial this book was offered in evidence by the state, and was received in evidence, despite the objection of counsel for the accused. In this there was no error. The book contained nothing connecting Kent with the homicide. It was not an unsworn narrative of past events implicating the accused. Behind every word of it was the oath of the accomplice. His testimony was that what he had set down in that book fell from the lips of the prisoner, and that he wrote it there at his dictation. Certainly, what Kent said to him he might testify to. Had nothing been written in the book, and had Swedensky been able to remember the story Kent told him to tell, his testimony narrating that story would have been competent. It cannot be any the less competent

to prove what Kent said to Swedensky, by a written memorandum of it, so long as the latter swears that that memorandum does in fact set forth the explanation of the killing, as dictated to him by Kent. The counsel for the accused treats the book as containing a mere declaration by Swedensky, unsupported by his oath, whereas in fact every word which this book contains has the oath of the witness behind it. He swears that the story written in this book was written there before the homicide, and is the very story which Kent dictated to him to write. In allowing this book to be received in evidence in connection with Swedensky's testimony, the court merely permitted the state to prove by the latter just what Kent said to him in connection with, and in furtherance of, the criminal scheme. If the fact that this story was written down by Swedensky before the murder tends to corroborate his testimony, it will not be because of his declaration or act that he is corroborated, but for the reason that it is improbable that he could write this story without the aid of Kent. If, for instance, it contains facts which Swedensky could not have known in advance without receiving information of them from Kent, then the fact that he knew such matters before the murder is a very pertinent fact, and one that it is entirely competent to prove. One way of proving it is by showing that the witness had written down such facts before the murder. If, on the other hand, the story is one which Swedensky could have fabricated himself without the aid of Kent, then the mere fact that it was reduced to writing will not prejudice him any more than proving it by the lips of Swedensky without any writing. The jury may regard it as a fabrication of his own, and may look upon his evidence that Kent told him to write it as perjury. If the fact that Swedensky wrote this before the murder lends any support to his testimony touching the alleged conspiracy to kill the woman, and Kent's connection therewith, it is not because of any unsworn declaration of the accomplice, but because the circumstances of the case make improbable that he could have known of facts stated therein unless Kent had told him of them. We fully agree with

counsel for the accused that the accomplice cannot corroborate himself by his own words or deeds. The corroboration, to satisfy the statute, must come from some independent source, and must tend to conneet the accused with the crime. Mere corroboration as to immaterial matters testified to by the accomplice, or as to the fact that a crime had been committed; or as to the connection of the accomplice therewith, or as to all these combined, will not suffice. The rule is very accurately stated in *People* v. *Plath*, 100 N. Y. 590, 3 N. E. 790: "There must be some fact deposed to, independently altogether of the evidence of the accomplice, which, taken by itself, leads to the inference, not only that a crime has been committed, but that the prisoner is implicated therein." It is not necessary that such corroborating evidence be sufficient, of itself, to warrant a conviction. The requirements of the statute making it necessary to corroborate the testimony of an accomplice are met if the evidence tends to connect the prisoner with the commission of the crime. Said the court in *People* v. *Everhardt*, 104 N. Y. 591, 11 N. E. 62: "The law is complied with if there is some evidence fairly tending to connect the defendant with the commision of the crime, so that the conviction will not rest entirely upon the evidence of the accomplice." See, also, *People* v. *Cloonan*, 50 Cal. 449; *State* v. *Van Winkle*, (Iowa,) 45 N. W. 388; *State* v. *Hicks*, (S. D.) 60 N. W. 66, and cases cited; *State* v. *Russell*, (Iowa,) 58 N. W. 890; *State* v. *Townsend*, (Or.) 23 Pac. 968. The language of our statute is so plain that no room is left for interpretation. It provides that "a conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense, or the circumstances thereof." Comp. Laws, § 7384.

It was objected that the accomplice was allowed to translate the story he had himself written in Bohemian in this book at the dictation of Kent, as he claims. His evidence shows him to have

been qualified by his knowledge of the English language to make the translation. The translation itself confirms his testimony in this respect. It was originally given to him in English, and by him set down in Bohemian. Certainly, he is qualified to translate it back into English. The fact that he was an accomplice might affect the weight to be given to his translation, but the danger of deception from a false translation of a writing is slight, when compared with the danger of deception from allowing an interested person to act as interpreter of words spoken on the witness stand in a foreign tongue, which leave behind them no fixed record by which the untruth of the interpreter's rendering of the testimony of the witness can be determined. And yet it has been held not to be error to permit a person sustaining quite close relations with one side of the case to interpret for a witness who was sworn on the same side of the cause. *Swift* v. *Applebone*, 23 Mich. 252. See, also, *Railroad Co.* v. *Shenk*, (Ill. Sup.) 23 N. E. 436; *Com.* v. *Kepper*, 114 Mass. 278. The defense had the right to prove that Swedensky's translation was not correct. Any qualified person might have been called for that purpose.

On the cross-examination of the accomplice, Swedensky, counsel for the accused asked him whether he expected to be hung for his crime. This question being objected to by counsel for the state, the court sustained the objection. In this the court committed error. One who is on trial for his life should be allowed great latitude in the cross-examination of the witness who, by his own confession, can have no hope of escaping the death punishment save through the indulgence of those who, under the law, have his life in their hands. An accomplice, in such a case, in implicating another with him in guilt, is under the influence of the most powerful motive that can shape human conduct. For this reason the law looks with such distrust on his testimony that, as a general rule, it will not suffer another to be convicted on his evidence, in the absence of corroboration. True, the principle has often been stated that one may be convicted on the uncorroborated testimony of an accomplice. But this princi-

ple has been regarded with such disfavor that, even in the absence of a statute, courts have generally cautioned juries against convicting where the story of the accomplice stood unsupported by other evidence. Sometimes they have advised the jury to acquit, and in some instances they have directed an acquittal. After conviction, new trials have been granted because the accomplice was uncorroborated. The practice has not been uniform, but the whole trend of it shows unmistakably that the law regards the testimony of the accomplice with distrust. See 1 Am. & Eng. Enc. Law, p. 76, and note 2, note to *Com.* v. *Price*, 71 Am. Dec. 671; *Com.* v. *Holmes*, 127 Mass. 424. In many jurisdictions, because of statutory enactments, the accomplice must be corroborated by evidence that tends to connect the accused with the crime. Testimony coming from such an untrustworthy source should be thoroughly sifted. The rule is to allow great latitude in the cross-examination of the accomplice. Whart. Cr. Ev. § 444; 1 Am. & Eng. Enc. Law, 78; *Lee* v. *State*, 21 Ohio St. 151. Certainly, he who is on trial for life may inquire of the accomplice who has sworn against him whether the testimony is not given with the hope of escaping death. The only object of proving that the accomplice has or has not been promised total or partial immunity is to strengthen or weaken his credibility by showing that his testimony is given possibly without hope, or that in giving it he may be influenced by an expectation of total or partial exemption from punishment, as a reward for such testimony. Even if no express promise of immunity is made, the accomplice may be led to believe by something in the conduct or speech or tone of voice of some one connected with the prosecution that nevertheless his testimony involving another in guilt with him will earn him some consideration at the hands of those who control his fate. We are therefore clear that, even when all the positive evidence is against the proposition that any express promise has been made, it is competent to ask the accomplice, as affecting his credibility, whether he expects to have full punishment meted out to him. Even when the accomplice has nothing

in the way of word or conduct from any one connected with the prosecution on which to build an assurance, he may have some expectation—leading all the way from a faint glimmer of hope to confident belief—that, if his testimony results in the conviction of another, he himself will reap some reward. One whose life he is swearing away has a right to discover, if he can, by the admission of the accomplice himself, that his testimony is given under a hope of life, which he cannot entertain unless he looks for indulgence. The accused has a right to have such fact laid before the jury on the question of the accomplice's credibility. Whether he is justified in cherishing such hope is immaterial. The only evidence in the case that Swedensky had not been promised immunity was his own. Counsel for accused offered to prove that no complaint had ever been made against him for this murder, that he had had no preliminary examination on such charge, and that no information had been filed against him to put him on trial for this offense. This evidence was excluded. In this the court erred. It bore directly on the question whether he was not testifying under hope. Without any express promise, he might infer from the fact that no proceedings had been taken against him, but that the whole strength of the prosecution was directed against Kent alone, that he was to be the recipient of some favor. So long a period had elapsed at the time of the trial, since Swedensky had confessed,—three months,—that the failure to preceed against him might cause him to expect indulgence. In ruling out this evidence the trial judge made a statement that must have been prejudicial to the accused. He said: "It is evident from the record in this case that the witness Swedensky is a criminal, and it would be the duty of the judge of this court to see that he is prosecuted." Such a remark might well lead a jury to believe that they were to look upon the testimony of Swedensky as the testimony of a man swearing without hope, and therefore not to be distrusted as the evidence of a person who expected to gain some personal advantage by giving it. At the time this remark was made by the court, Swedensky had

already testified. In weighing his credibility the jury were to consider, not the fact that the court said he would be punished, at a time when the remark could have no effect on his testimony, but the actual hope which he himself entertained at the time he gave his testimony. The prejudicial effect of this error must have been augmented by what the trial judge stated to the jury on this subject in his charge. He said, "The witness Swedensky is not on trial, and the fact that he is or is not on trial should not influence you, in the least degree, in passing upon the guilt or innocence of this defendant whom you have in charge." The case of *People* v. *Hare,* (Mich.) 24 N. W. 843, is a direct authority on the point that excluding this evidence was error.

The accused interposed a challenge to the panel of the special jury summoned by the sheriff under a special venire issued by the court after the regular panel had been exhausted. The ground of the challenge was the bias of the sheriff. It was made under § 7347, Comp. Laws, which provides as follows: "When the panel is formed from persons whose names are not drawn as jurors a challenge may be taken to the panel on account of any bias of the officer who summoned them which would be good ground of challenge to a juror. Such challenge must be made in the same form and determined in the same manner as if made to a juror." The test of the sheriff's qualification to summon such special jury is whether he would be qualified to sit as a juror in the case. It has been so held in California under the same statute. *People* v. *Coyodo,* 40 Cal. 592; *People* v. *Welsh,* 49 Cal. 174. On his examination under this challenge the sheriff testified that he had expressed to others his opinion that the accused was guilty, and it is apparent that this opinion was very strong. It would seem that it was derived from statements made to him by the accomplice, Swedensky. If so, it is very doubtful whether the sheriff would have been competent as a juror in the case, notwithstanding the fact that he testified that, if summoned as a juror, he would give the accused a fair and impartial trial according to the law and the evidence. *Greenfield* v. *People,* 74 N. Y.

277; *Jackson* v. *Com.*, 23 Grat. 919; *Armistead* v. *Com.*, 11 Leigh, 657; *Black* v. *State*, 42 Tex. 378; *Goodwin* v. *Blachley*, 4 Ind. 438; *Frazier* v. *State*, 23 Ohio St. 551; *Woods* v. *State*, (Ind. Sup.) 33 N. E. 901; *People* v. *Wells*, (Cal.) 34 Pac. 718; *Walker* v. *State*, 102 Ind. 502, 1 N. E. 856; Comp. Laws, § 7361. It is, however, unnecessary for us to settle this question, as the person who was sheriff at the time this case was tried is no longer sheriff of Morton County.

The judgment and order are reversed, and a new trial is ordered. All concur.