The STATE of North Dakota, Plaintiff
and Respondent,

v.

Ambrose LITTLE BEAR, Defendant
and Appellant.

Cr. 314.

Supreme Court of North Dakota.

Aug. 20, 1964.

Helgi Johanneson, Atty. Gen., Bismarck, and Eugene A. Kruger, State's Atty. of Cass County, Fargo, for plaintiff and respondent.

Edward J. Murphy, Fargo, for defendant and appellant.

MORRIS, Chief Justice.

An Information was filed in the District Court of Cass County charging Ambrose Little Bear with murder in the first degree for causing the death of Fred Shaw on February 14, 1963. Upon a trial by jury, a verdict was returned finding the defendant

guilty of murder in the second degree. The defendant appealed from the judgment and sentence rendered on the verdict. A motion for a new trial was made and denied before the entry of judgment. Both the motion and the appeal from the judgment challenge the sufficiency of the evidence to support the verdict. No errors of law are specified.

At about 6:30 p. m., on February 14, 1963, two men were murdered by blows from a blunt instrument. They were Fred Shaw and John (Cyclone) Johnson. The murders took place in the small home owned and occupied by Johnson at 52 Main Avenue in the City of Fargo. Shaw had come to live with Johnson two or three days before the murders. The bodies were discovered by a third man who also lived in the Johnson house and who, after being absent all day, returned about 10:30 in the evening. He immediately called the police. Johnson's body was lying on the floor. Shaw's body was on a couch or daybed in the corner of the same room.

The defendant, Ambrose Little Bear, and his cousin Benedict Lovejoy had been drinking wine and beer during the afternoon preceding the murders. Little Bear had lived with Johnson for about a week and a half a short time before the murders. Lovejoy who had recently returned from military service, did not know Johnson. Little Bear told Lovejoy sometime during the afternoon that Johnson had lots of money and that he sometimes loaned money to Indians. At about four o'clock in the afternoon they went to Johnson's place but because a stranger was there they did not ask about money, and stayed only a few minutes. They returned to the Johnson place later that evening. The first stranger had gone, but Fred Shaw was there. Neither Lovejoy nor Little Bear knew Shaw. During that visit the killings took place. Both men were charged with first degree murder, Lovejoy for killing Johnson, and Little Bear for killing Shaw. Lovejoy pleaded guilty to second degree murder and

was sentenced. Little Bear stood trial. He blamed both killings on Lovejoy.

After Little Bear had moved out of the Johnson house, he lived with Lovejoy at another address for about two weeks prior to the murders. Lovejoy was called as a witness for the State. His recollection of what happened at the time of the murders was vague. He remembered being at the Johnson house and talking to Johnson. When he heard the word "now" uttered in the Sioux language, he swung at Johnson who threw Lovejoy to the floor. As they rolled on the floor, he grabbed an object that looked like a ball-peen hammer. Lovejoy testified that after the fight at the Johnson place, he and Little Bear went to the room of Lena Rattling Tail. Mrs. Rattling Tail was Little Bear's mother. They then went to a house where they lived with the defendant's half-brother, Francis Rattling Tail. He was home when Lovejoy and Little Bear arrived. Francis Rattling Tail testified that Little Bear changed clothes and said that he "was going to pull out." He heard Little Bear say something about having a fight with another fellow and that "he knocked this guy off." Lovejoy and Little Bear were intoxicated.

A ball-peen hammer was found in the murder room. Another instrument lay on the floor near Johnson's body, which proved to be a hatchet with the blade broken off but the head otherwise intact. Both instruments were introduced in evidence. The defendant, at the time of the murders, was wearing a lined denim jacket. Fibers from this jacket were found on the jacket of the deceased Fred Shaw, on the trousers worn by Shaw at the time of his death, and on his right hand. Fibers from the defendant's jacket were also found on Johnson's shirt and trousers and among his fingernail scrapings. Fibers from the defendant's jacket were also found on the broken hatchet that lay on the floor beside Johnson's body. The defendant argues that the fibers may have been shed from his jacket during the time he lived in the house some

weeks before. However, the jury could well have been unimpressed by that argument because of the varied places in which the fibers were found, and particularly in view of the fact that Shaw had come to live with Johnson only two or three days before the murder and that Little Bear was not acquainted with Shaw.

Ambrose Little Bear testified in his own behalf. There were no other witnesses for the defense. He stated that during the afternoon drinking bout he told Lovejoy that Johnson had money and loaned money out to Indians, but Little Bear never asked Johnson for money. He testified that he and Lovejoy were short of money and asked Lovejoy "if we could borrow money from Cyclone Johnson." He said that they went to Johnson's house the first time because Lovejoy wanted to borrow some money from him. When they arrived, a stranger was with Johnson. The stranger was not Fred Shaw. They stayed only three or four minutes. He denied Lovejoy's testimony about the use of an Indian word meaning "now." He saw the ball-peen hammer at Johnson's, but denied ever seeing the broken hatchet. On the second visit, during which the murders took place, Lovejoy and Little Bear were only at the house about ten minutes, during which the fatal injuries were inflicted on Shaw. The defendant says that he entered Johnson's house first, started talking to Johnson, then sat down beside Shaw and started talking to him. When Lovejoy and Johnson started fighting, Shaw, who was sitting on the bed, tried to get up, and the defendant hit Shaw with his fist. Shaw was unconscious for a few seconds, then sat up. The defendant stood up, turned around, and saw his cousin coming at Shaw with a butcher knife. The defendant took the knife away from him and threw it in a corner. Johnson was lying on the floor covered with blood. He said to his cousin, "Let's get out of here." Little Bear took the lead and started out, with Lovejoy behind him. His cousin didn't come out, so the defendant turned back into the house and saw Lovejoy beating Shaw with the hammer or hatchet. Then they both left. The defendant did not like the way Johnson treated him when they lived together. The defendant said he wasn't drunk, but wasn't sober, either; was feeling pretty good. He admitted that he told his half-brother, Francis Rattling Tail, that he was going to change clothes and pull out.

"Every person concerned in the commission of an offense, whether he directly commits the offense or procures, counsels, aids, or abets in its commission, may be indicted or informed against as principal." Section 29–11–42, NDCC.

This statute abrogated the common law distinction between a principal and an accessory before the fact with respect to criminal prosecutions and permits one who procures, counsels, aids or abets in the commission of a crime to be charged and prosecuted as a principal. State v. Kent, 4 N.D. 577, 62 N.W. 631; State v. Geddes, 22 Mont. 68, 55 P. 919; State v. St. Pierre, 59 S.D. 169, 238 N.W. 875; Scharman v. State, 115 Neb. 109, 211 N.W. 613; Hunter v. State, 47 Ariz. 244, 55 P.2d 310; State v. Ayres, 70 Idaho 18, 211 P.2d 142.

The court instructed the jury on the substance of Section 29–11–42, NDCC, and no doubt having in mind the particular evidence before the jury in this case, stated:

"The mere presence of a man when a crime is being committed by another man does not make him guilty. It is when he is present aiding, abetting, and encouraging the other man to commit it that he is guilty."

The jury, acting under the unchallenged instructions of the court, weighed the evidence and brought in a verdict of guilty.

In our consideration of the sufficiency of the evidence in this case we have been guided by former pronouncements of this Court. The first two paragraphs of the

Syllabus by the Court in State v. Moore, N.D., 101 N.W.2d 579, state:

"The trial court in a criminal case is clothed with a wide discretion in passing on a motion for a new trial based on insufficiency of the evidence and his determination will not be disturbed unless there appears to have been an abuse of that discretion.

"Where there is substantial evidence to support the verdict it is not an abuse of discretion on the part of the trial court to refuse to grant a new trial on the ground of insufficiency of the evidence."

In State v. Bossart, 61 N.D. 708, 240 N.W. 606, it was said:

"Where it is alleged the evidence is insufficient to sustain the verdict, such evidence will be examined to see whether there is substantial evidence upon which the jury could found its verdict, and where there is such evidence ample and competent, even though it be contradicted, the judgment will not be reversed."

In the more recent case of State v. Alfstad, N.D., 98 N.W.2d 371, we said:

"Questions of the weight of the evidence and the credibility of witnesses are always for the jury, and a verdict based on substantial evidence, even though contradicted by the defendant, will not be disturbed on appeal."

Our examination of the evidence in the light of the foregoing rules impels us to the conclusion that the verdict is not against the evidence, but on the other hand the verdict is in accordance with and supported by substantial evidence. The judgment is affirmed.

ERICKSTAD, BURKE and TEIGEN, JJ., concur.

STRUTZ, J., did not participate.