WHITTINGTON OWENS *v.* STATE OF MISSISSIPPI.

1. CRIMINAL LAW. *Presumption of innocence. Defendant's failure to introduce evidence.*

A defendant charged with crime is presumed innocent until the contrary is shown; a conviction must rest upon affirmative evidence of guilt, and not on defendant's failure to show innocence.

2. SAME. *Threats. Class threatened.*

It is not admissible on the trial of a defendant · charged with the murder of a revenue officer for the state to prove a statement made by the accused more than a year before the homicide, but shortly after a revenue officer was reputed to have been fired upon in the vicinity where the homicide occurred, to the effect that "if the revenue officers don't quit bothering out there, more of them will be shot. I don't mean that I will do it, but it will be done." Such a statement is not a threat either against the decedent or a class of persons to which he belonged, or any body else.

3. SAME. *Impeachment of witness. Instruction. Accomplice.*

Where a conviction depends solely upon the testimony of an accomplice, who is a confessed perjurer, it is error to refuse defendant an instruction to the effect that if the jury believe from the evidence that any witness had, theretofore or on the trial, sworn falsely to any material fact in the case, they may disregard his testimony altogether, although the court had previously charged the jury that they were the sole judges of the credibility of witnesses.

4. SAME. *Aimed at particular witness. Intent of witness.*

Such an instruction is not objectionable because aimed at a particular witness (*Norwood, etc., Co. v. Andrews*, 71 Miss., 641), nor because it omitted the idea of the false swearing being intentional, since it was impossible, under the facts of the case, that the false testimony was mistakenly given.

5. SAME.

An instruction accurately drawn and appropriate to the facts of the case, informing the jury that witnesses can be impeached by evidence that they had made statements and testified under oath at

other times and places materially in conflict with their testimony
on the witness stand, and that the jury may disregard the testi-
mony of any witness so impeached, ought to be given; nor is such
an instruction objectionable because it concludes with the state-
ment that the testimony offered to impeach a witness was admitted
to show him unworthy of belief, and not directly to establish the
guilt or innocence of the defendant.

6. SAME. *Reversible errors.*

A mere technical error, not vital in its nature, is not cause for re-
versal of a conviction; but where the defendant, upon his trial,
has been denied a right guaranteed by the constitution and laws
of the state, especially where the conviction rests alone upon the
testimony of a confessed perjurer, the interest of society, as well
as the rights of the defendant, demands a reversal.

FROM the circuit court of Lafayette county.

HON. PERRIN H. LOWREY, Judge.

Whittington Owens, the appellant, was indicted in the cir-
cuit court of Lafayette county, at the December special term,
1901, for the murder of Hugh Montgomery. The indictment
was a joint one against Owens, Orlandus Lester, William
Matthis, and William Jackson. The same parties were also
indicted by the same grand jury for the murder of John A.
Montgomery. There was a severance in each case, and each of
the defendants were separately tried, Owens on each of the
indictments. Orlandus Lester was convicted and sentenced to
death. William Matthis was also convicted and sentenced to
death. William Jackson was convicted and sentenced to the
penitentiary for life. Whittington Owens, the appellant, was
convicted upon the indictment for the murder of John A. Mont-
gomery and sentenced to the penitentiary for life. He was
convicted on the indictment for the murder of Hugh Mont-
gomery and sentenced to death. He appealed from both con-
victions to the supreme court. The facts in reference to these
murders, as disclosed by the record, are these: William Matthis,
one of the indicted parties, had been charged in the United
States court for the northern district of Mississippi with the

unlawful distilling of whisky, commonly called "moonshining." The decedents, Hugh Montgomery and John A. Montgomery, were deputy United States marshals, called, in the moonshine districts, "revenue officers." They had placed in their hands on the day they were murdered a warrant from the United States court for the arrest of William Matthis. They left Oxford and proceeded to the residence of Matthis, arriving there quite late in the afternoon, finding Matthis at home, engaged in some domestic business somewhat inconvenient for him to abandon. He prevailed with the officers to remain over night with him at his country home, promising that he would go to Oxford with them the next morning and execute a bond for his appearance in the United States court to answer the charge for which the officers held the warrant. Orlandus Lester, a negro, was in the employment of William Matthis, aiding him about the domestic affair, the suspension of which, for the accommodation of Matthis, was not insisted upon by the officers. On the trial of the cases it appeared that after the officers had retired for the night, Matthis, Jackson, and Lester went into the room, where they found them asleep in bed, and killed them with guns, after which Matthis moved their bodies to a point near the center of the building and set fire to the house, burning it down over the bodies of the victims, believing that thereby he could destroy all evidences of guilt. It was shown in evidence that Owens, the appellant, was the father-in-law of Matthis and resided a mile and a half or two miles distant from him. The only affirmative testimony against the appellant was that of Orlandus Lester, one of the convicted defendants, who testified that after the officers had consented to remain during the night at the home of Matthis, he [Lester] at Matthis' request, went over to Owens' residence to ask Owens, as directed by Matthis, to come and bring his gun and aid in killing the revenue officers. Lester testified that he delivered this message to Owens, who declined to go, giving as a reason therefor that if he left home, his wife would raise a racket and dis-

turb the neighborhood; that Owens sent his gun and some buckshot by Lester, together with a message to Matthis to the effect that Matthis, Jackson, and Lester could do the work well and must not allow the revenue officers to escape. This was the testimony of Lester on his direct testimony. On his cross-examination he testified that all that he had said on his direct examination connecting Owens with the murders was untrue, and that he had so testified because Matthis had told him to so swear, and because he believed that by so swearing he could escape the gallows himself. On re-examination Lester again asserted the truth of the matters of fact which he had affirmed on his direct examination, claiming that he had sworn falsely on his cross-examination. He further admitted that he had sworn falsely in the trial of several of the other cases growing out of the murders, and that he had on divers occasions and to divers persons made false statements about the homicides. The records in the two cases against Owens were practically the same, although there are some minor differences, which are mentioned in the opinion of the court. The opinion was delivered in the case in which appellant was sentenced to death, but it was controlling in both cases. The instructions in the cases are sufficiently stated in the opinion.

*Stephens & Stephens* and *McWillie & Thompson,* for appellant.

Certainly no man ought to be convicted of any offense on such testimony as that of Lester. The representative of the state sought to help out Lester's testimony by proof of a previous threat, but the so-called threat was not a threat, and was made long anterior to the murder.

We confidently insist that the words of the accused, as given by the witness, Matthews, do not indicate that the former intended to do anything whatever, much less commit a crime against the lives of his fellowmen. Indeed, the words expressly negative the idea that he intended to resort to violence,

and there is nothing in the evidence to show that anything had occurred to arouse his personal animosity against the revenue officers. If such expressions as that employed by the accused on the occasion in question are to be interpreted as threats, few of us can be said not to have threatened to commit crime. It was rather the expression of an opinion by one who knew the state of feeling of the lawbreakers against certain persons then in office who had so conducted themselves as to excite animosity. The resentment indicated may not have been directed against the Montgomerys in the least degree, so far as the defendant knew, or meant to declare. We do not doubt that many law-abiding men have said that as long as negroes continue to commit certain crimes there will be lynchings in Mississippi; but this does not by any means indicate an intention to participate in the lynchings, although unaccompanied by any disclaimer of such purpose. We do not deem it essential to controvert the decisions which hold that previous threats not directed against any particular person are admissible against one accused of homicide, although the proposition is by no means clear under the decisions of this court. *Hinson* v. *State*,. 66 Miss., 532. But we most earnestly contend that no court has ever admitted as threats previous declarations of the accused which did not include the idea that he intended to work ill to some one. Whether the language used is, in legal contemplation, a threat, is one for the court to determine, and the action of a lower court in excluding declarations relied on as threats has been approved by this court. *Hinson* v. *State, supra.*

In one case it has been held that a declaration of the defendant made three months prior to the homicide that he "intended to kill the next deputy marshal that arrested him" was improperly admitted as too remote and general to have any legitimate bearing on the issue. *Stevenson* v. *United States,* 86 Fed. Rep., 106. The deceased was a deputy marshal at the time of the killing in the case last cited, although the evidence

tended to show that he was acting not as a deputy marshal, but as a constable. In the late case of *Shaw* v. *State,* 79 Miss., 21 (s. c., 30 So., 42), it was held to be error to admit evidence of threats made by the accused against the brother of the deceased seven or eight months prior to the homicide.

In the case at bar the accused never stated that he intended to kill any one. Moreover, fully twelve months had passed before the killing took place, and to the remoteness of intent, as gathered from the language used, is added the remoteness of time. This remoteness of time operates against the admissibility of the declarations not alone on the ground that the intention expressed may have been wholly abandoned in the meantime, but also with the lapse of time the recollection of witnesses as to the exact language used becomes more or less indistinct. In this very case the witness had to qualify his quotation of the language of the accused by saying that "as well as he could remember" certain words, or rather "about" certain words were used, and, in giving them twice, stated them differently. Where so much depends on the phraseology employed, testimony which shows that the witness is unable to give the words used should not go to the jury. If the witness had repeated a few more times what Owens stated, he might have so far changed his version of the language used as to have become a good witness for the defense.

The court below refused to charge the jury at the defendant's request, that if they believed that any witness had theretofore, or on the trial in progress, sworn falsely to any material fact in the case that they might disregard the testimony of such witness altogether.

On the state of case before the jury, the instruction was clearly correct and of the utmost importance to the accused. There is to be found no justification for the refusal of this instruction i nthe fact that in another instruction authorizing the jury to convict on the testimony of an accomplice, they had been told that they were the judges of the credibility of all

the witnesses. The accused was entitled to have the jury instructed as to their right to disregard altogether the testimony of any witness who had sworn falsely when the state was relying absolutely on the testimony of one who, besides being an accomplice, was a confessed perjurer, who acknowledged that he had sworn falsely touching the same transaction, but a few days before, and had also sworn falsely in respect thereto on his direct examination in the trial in progress.

It has been held by this court that in a case where the evidence warranted the belief that an important witness for the state was an accomplice it was error to refuse an instruction for defendant that "the testimony of an accomplice should be received with great caution, and the jury may disbelieve such testimony altogether," although the jury had already been instructed that it was the sole judge of the evidence and might disregard the testimony of such witnesses as it did not believe. *Green* v. *State,* 55 Miss., 454.

The case at bar was not merely one where the evidence warranted the belief that the witness was an accomplice, but one where the witness was by his own admissions an accomplice, and in addition thereto a phenomenal liar and perjurer. The instruction was permissive merely, and did not bind the jury to disregard the testimony, as in *Finley* v. *Hunt,* 56 Miss., 222, 223.

No tenable objection to the instruction can be made on the idea that it was aimed at a particular witness. The case is not like that of *Railway Company* v. *Tate,* 70 Miss., 348, where the instruction was asked by the plaintiff, and the testimony of the only witness for the defendant was uncontradicted and neither improbable nor unreasonable. The instruction refused in the case at bar is in this regard sanctioned by the decision of this court in *Norwood, etc., Co.* v. *Andrews,* 71 Miss., 641.

It is idle to say that the errors above complained of did not prejudice the defense of the accused. The case was one in which every right of the accused should have been most jealously guarded.

An instruction asked by the appellant was erroneously refused. It was in the·following words: "The court instructs the jury for the defendant that witnesses may be impeached by showing that they have made statements at other times and places materially different from the testimony on the witness stand; and the jury may disregard the testimony of any witness or witnesses who are shown to their satisfaction to have willfully made statements or given sworn testimony at other times and places materially in conflict with their testimony on the witness stand in this case. But the testimony to impeach the witnesses is for the purpose of showing such witnesses to be unworthy of credit and not directly to establish the guilt or innocence of the defendant." This instruction was above criticism; and it was extremely important that it should have been given. It was wrongfully refused, and that, too, in a case which called for such a charge as strongly as any case possibly could. The authorization to the jury to receive and act on the testimony of Lester without corroboration made the charge especially important.

*W. L. Easterling,* Assistant Attorney-General, for appellee.

The assignment of error based upon the action of the trial court in admitting in evidence a threat made by defendant to P. E. Matthews against the "revenue officers" about a year before the murder was committed is not well taken. This evidence was clearly admissible as a threat and as showing a common interest with them (his son-in-law, Matthis, and others), and a reason or motive for his sharing the criminal intent of the crime afterwards committed.

It was a threat against a class, and was a threat or warning delivered to this class not to do, except at the risk of their lives, the very thing which these officers were endeavoring to do, at the very time they were shot and killed. It shows, when considered with the circumstances and relationship of the parties that the criminal intent was shared, if not originated, by defendant.

True, if the remark had been made by one who was not identified in any way with those who were being bothered by these "revenue officers," there might be some ground for the argument that this was simply an innocent expression of an opinion; but not so in this case, it was a matter of deep and near concern to this defendant, and he speaks, though it be a year before the commission of the crime, from an enangered motive, and his words are prophetic and full of unmistakable intention.

There is no authority against the admission of like threats under anything like similar circumstances.

"Threats made by accused are competent in proof, nearness or remoteness of time, conduct and the like will affect weight." Bishop Criminal Pro., sec. 1110; 150 Mass., 401; 35 S. C., 28, "Always relevant;" 11 Am. & Eng. Enc. Law (2d ed.), 505.

The cases cited by counsel for appellant are not authority against this point. In the case of *Hinson* v. *State*, 66 Miss., 532, the offered threat was made by the deceased, and is different entirely; it was distinctly held that the remark made by Simmons, the deceased, could not be construed to mean a threat against defendant, as he had no notice that defendant had accused him of shooting at defendant. And, furthermore, the court distinctly says that it was not admissible because no overt act by the deceased had been shown, which is a prerequisite of the admission of any threat made by deceased.

In the case of *Stephenson* v. *United States*, 86 Fed. Rep., 106, the threat made by defendant was a threat against deputy marshals and the deceased who was attempting to make the arrest of defendant at the time he was killed was acting simply as a constable; and furthermore the difficulty which resulted in the killing of the officer arose upon an entirely different matter, so far as the report of the case shows, and not connected with any previous condition of facts which moved the defendant to make the threat, and the motives and causes for the

killing were to be sought for alone in the occurrences of that particular time when the difficulty occurred. The court distinctly says the threat was not admissible, because the officer who arrested defendant was not acting as deputy marshal. And this case is therefore no authority on this point.

In the other case cited, *Shaw* v. *State,* 79 Miss., 21, s.c., 30 So. Rep., 42, the threat was not admissible, because not made against the defendant himself, but against his brother; and no common purpose or intention was shown to exist in the minds of the two brothers to antagonize or injure defendant, and no animosity of defendant against the two brothers was shown; and of course no sufficient connection with the difficulty which occurred between the defendant and the brother of the threatened man.

Appellant assigns for error that the court erred in refusing to charge the jury that they may disregard the testimony of any witness if they believe from the evidence that such witness has heretofore or on this trial sworn falsely as to any material facts in this case." This instruction omits the very important qualification that the false swearing must be willfully done. The reason is simple, but conclusive; not every man who swears falsely is a perjurer, and unworthy of credit. The instruction was therefore properly refused.

Argued orally by *H. D. Stephens, T. A. McWillie* and *R. H. Thompson,* for appellant, and by *W. L. Easterling,* Assistant Attorney-General, *W. A. Roane,* district attorney, and *W. A. Montgomery,* for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

This case is not like that of Matthis (*ante,* 491) or Lester. In those cases the guilt of the parties was shown by overwhelming evidence of the most positive character. This appellant was not present at the killing, and the effort here is to show that he was an accessory before the fact. But this rests wholly

upon the testimony of Lester, a confessed perjurer. It was earnestly argued that Owens did not take the stand, and that no member of his family took the stand, to contradict Lester as to what Lester said occurred at Owens' house between him and Owens. But the state must convict on affirmative testimony showing the guilt, not on the failure of the defendant to show his innocence. That innocence is presumed till the state has shown the contrary. The conversations overheard between Owens and others in the jail are not addressed to the point of showing affirmatively his guilt. They are not affirmative evidence of participation in the crime as accessory before the fact, and it is not, of course, argued that they involve any confession. They have their due weight as evidence, but it is perfectly plain that this conviction must rest exclusively on the testimony of Lester.

On the trial of this case the witness P. E. Mathews was permitted to testify to an alleged threat. What he says on that subject is as follows: "Q. State to the jury if you have ever heard him make a statement with reference to the killing of revenue officers? If so, state to the jury when and where it was, and what was said? A. Yes, sir; I heard him make a statement. (Counsel for defendant objected. Objection overruled. Exception taken.) Q. Tell the jury when and where it was, and what was said? A. I don't remember exactly the date. It was some little time after Dave Rogers was shot at out here south of town. I had a conversation with him. By the court: About how long ago? A. It was something over a year ago. My recollection is it was in the summer or fall of 1900. Q. At that time what was Dave Rogers? A. Deputy United States marshal. By court:: State the words that were said by Whit Owens? A. I had a conversation with Mr. Owens here in town, near the federal court building. His statement to me was, if the revenue officers didn't quit bothering out there, there would be some more of them shot. (Counsel for defendant objected as incompetent, too remote, etc. Objection

overruled. Exception taken.) Q. Did you say anything to him, or him to you, further? A. Yes, sir; I told him that I thought it was improper to make that kind of a statement. (Counsel for defendant objected. Objection sustained.) By the court: I don't think Mathews' statement to Owens is admissible, and it is excluded. A. His answer was, 'I don't mean that I will do it, but it will be done.' That's about his language, as well as I remember it. (Counsel for defendant objected, and moved to exclude all this testimony. Objection overruled. Exception taken.)" The court should have permitted what Mathews said to Owens to go in evidence, if any part of the conversation were admissible. It was part of one continuous conversation, and what Mathews said to Owens is necessary to make intelligible Owens' response, "I don't mean that I will do it, but it will be done." It is not possible to sustain the admission of this testimony on the theory that it shows a threat. It is perfectly plain that Owens did not threaten these two officers individually; and counsel for the state concede that, but they say that it was a class— revenue officers as a class—who were threatened. Threatened by whom? Owens did not threaten to do anything himself. It is impossible to take his language and work out of it, by any just reasoning, any threat that he was going to injure, or aid in injuring, anybody. On the contrary, he expressly disclaimed the purpose of shooting any one himself. "I don't mean that I will do it, but it will be done." We think it perfectly clear that the language used contained no threat, within the meaning of the law. It was error to admit this testimony. The language was used more than a year prior to this trial. There is nothing in the evidence to indicate that, at the time this alleged threat was made, Owens had any cause himself for personal animosity towards the revenue officers. The most that can be said was that he was describing a state of feeling that existed in his community towards revenue officers as a class, but when he couples with this statement the distinct declara-

tion, "I don't mean that I will do it," it must be perfectly obvious that this falls far short of stating any threat on his part that he indivdually would shoot, or aid in shooting, any revenue officer. Within none of the principles laid down in the law books as to what constitutes a threat can this language be held to be a threat. See *Hinson* v. *State,* 66 Miss., 532 (6 So., 463). It was therefore error to admit this testimony. It is too obvious for discussion that this testimony was prejudicial in the highest degree to the defendant's rights. It must have weighed mightily with the jury. The same testimony was admitted in the other case against Owens. In one of these cases, singularly enough, the jury found the defendant guilty of murder, without fixing his punishment at imprisonment in the penitentiary for life; and in the other the jury, whilst finding him guilty of murder, merely fixed his punishment at imprisonment for life.

In this case, in which the prisoner was sentenced to death, the court refused to charge the jury for defendant as follows: "The court instructs the jury that if they believe from the evidence that any witness has heretofore, or on this trial, sworn falsely to any material fact in this case, they may disregard the testimony of such witness altogether." In the other case the court refused an identical instruction to the defendant in the following words: "The court instructs the jury that if they believe from the evidence that any witness has heretofore, or on this trial, sworn falsely to any material fact in this case, they may disregard the testimony of such witness altogether." Both these instructions should have been given in the respective trials. The fact that the court had charged the jury, in an instruction telling them that they were authorized to convict on the testimony of the accomplice alone, that they were the sole judges of the credibility of the witnesses, does not cure this error, on the peculiar facts of this case; for here the whole case for the state depended absolutely upon the testimony of this one witness, Lester. Without his testimony it was, of

course, impossible to convict defendant. He, and he only, testifies to the substantive facts affirmatively showing the defendant to have been an accessory before the fact in this horrible assassination. The whole purpose of the testimony was to connect Owens with the killing, and this connection is shown alone by the testimony of this witness Lester, and this witness is a confessed perjurer. There is scarcely a material fact in his testimony about which he does not confess that he deliberately perjured himself at different times. Nay, more than this, he actually confesses to deliberate perjury during the same examination in this case, contradicting under oath on the cross-examination the most solemn statements of fact fresh from his lips on the examination in chief. Could there be conceived a case in which it was more vital to a fair and impartial trial that these two instructions should have been given? They go to the very soul of the defense, to wit, that the state witness was wholly unworthy of credit. It was not sufficient, therefore, to have stated incidentally that the jury were the sole judges of the credibility of the witnesses, in the charge, not pointing specifically on that proposition, but on the totally distinct proposition that the jury might convict on the unsupported testimony of an accomplice. The principle of *Green* v. *State,* 55 Miss., 454, controls here, wherein it was held error to refuse an instruction for defendant that the testimony of an accomplice should be received with great caution, and that the jury might disbelieve such testimony altogether, although the jury had already been charged that they were the sole judges of the evidence, and might disregard the testimony of such witnesses as they did not believe. The charge in *Finley* v. *Hunt,* 56 Miss., 223, told the jury the witness "was not entitled to credit" as to any other matter as to which he had testified, if he had testified falsely as to any material matter, and was properly refused, because it commanded the jury to wholly disbelieve the witness in such case. It is not objectionable on the ground that it was aimed at the witness, Lester. This case is not like

that of *Railway Co.* v. *Tate,* 70 Miss., 348 (12 So., 333), in that respect. The testimony of the only witness for the defendant there was not only not contradicted, but was neither improbable nor unreasonable. Here the testimony of this witness is self-contradictory. He himself admits that he has deliberately perjured himself in his statement as given in the examination in chief and cross-examination on this very same trial. In such a case it is no objection that the instruction is aimed at testimony confessedly perjured. See *Norwood & Butterfield Co.* v. *Andrews,* 71 Miss., 641 (16 So., 262). It may be said that the instruction omits the word "intentionally," and that under *Railroad Co.* v. *Hedrick,* 62 Miss., 29, it was properly refused for that reason; but that case and similar cases refer alone to those instances in which it is possible that the false testimony may have been simply mistaken testimony, in which the witness may have stated a fact falsely (stated it as it was not), and yet done so unintentionally (testified falsely, in other words, by pure mistake). But it would be preposterous to claim that this witness testified falsely, in the many instances in which he admits that he testified falsely, simply by mistake. He leaves no room for the application of the principles announced in the cases cited. He confessed, callously and shamelessly, that he had not only perjured himself, but had done so in such a way that it is impossible not to see, clearly and plainly, that he had intentionally and deliberately perjured himself as to most material facts. Where, therefore, the facts show that the witness had intentionally perjured himself about material matters, it is wholly ·immaterial that the word "intentional" was omitted from the charge. The only object of putting the word "intentionally" in such a charge is to warn the jury that they should not wholly reject the testimony of a witness because he had testified falsely merely, if he had so falsely testified unintentionally (that is to say, by mistake); but where the jury see (they themselves), with overwhelming clearness, that the witness had intentionally per-

jured himself, the insertion of the word "intentionally" in the charge is wholly immaterial.

The court also refused in this case, in which the prisoner was sentenced to death, to give the following charge: "The court instructs the jury, for the defendant, that witnesses may be impeached by showing that they have made statements at other times and places, and have testified under oath at other times and places, materially different from their testimony on the witness stand. And the jury may disregard the testimony of any witness or witnesses who are shown, to their satisfaction, to have willfully made statements or given sworn testimony at other times and places materially in conflict with their testimony on the witness stand in this case. But this testimony to impeach the witness is for the purpose of showing such witness to be unworthy of credit, and not directly to establish the guilt or innocence of the defendant." It is impossible to conceive for what reason this instruction was refused. It is accurately drawn, peculiarly appropriate under the facts in this case, and eminently proper to have been given, and its refusal was a grievous error against the appellant.

Looking at these three errors, each one of them most vital and material to a fair and impartial trial, remembering that the conviction of the defendant rested exclusively upon the testimony of the witness, Lester, so far as the facts showing his connection with the crime are concerned, is it not manifestly the plain duty of this court to reverse? We are bound to administer the law justly and impartially. If the jury, believing the witness, as they had a right to do, had found him guilty, the court having committed no reversible error in its rulings on the evidence and instructions, we would have disregarded all minor errors and affirmed the conviction; but it is impossible for any court of last resort to affirm a conviction resting, like this, on the solitary testimony of a callous and shameless perjurer—a confessed perjurer—where the court has committed three errors, each vital, in the highest degree, to a

fair and impartial trial. We repeat what we stated in the case of *Ellerbe* v. *State,* 75 Miss., 531 (22 So., 952; 41 L. R. A., 569): "If this error were a merely technical one, not vital in its nature, we would not for that alone reverse the judgment. . . . So far as the lawful power of this court can be exerted in affirming convictions for violations of the law of the land, it shall be exerted; and mere technical errors, without intrinsic merit, when we can, after careful and thorough examination of the whole case, confidently say that the right result has been reached, that substantial justice has been done, and that on a new trial no other result could reasonably be arrived at, will not avail here for reversal in civil or criminal cases; but where the defendant has been, as here, denied a right secured to him by the constitution and the laws of the land, we are compelled to reverse the case. In such cases the interests of society, the stability of the laws, the due administration of justice, demand a reversal. Disregard of fundamental right in the case of the guiltiest defendant, his conviction in violation of settled constitutional and legal safeguards intended for the protection of all, are not things which affect the particular defendant in a given case alone, but, in their disastrous and far-reaching consequences, involve, in future trials, the innocent and guilty alike, subvert justice, and disorganize society. Guilt should be punished certainly and condignly, most assuredly; but guilt must be manifested in accordance with the law of the land, else some day the innocent, who are sometimes called to answer at the bar of their country, may come to find themselves involved in a common ruin, and deprived of the legal trial necessary to the vindication of their innocence." Where the crime committed is one as atrocious and infamous as this, there is all the more reason, on the one hand, why the court, sitting serene amid the tumult of feeling, should hold the scales of justice with even balance; see to it that no just right of the accused is swept away in the tempest of passion aroused by the enormity of the crime; and, on the other, why the court should be liberal

in its rulings to the defendant, since the result is, in such case, almost certainly conviction, if there be any testimony warranting it, and hence the common sense and sound judgment of the jury may well be trusted to reach the right result without the aid of vicious rulings on the evidence and the instructions. We say this much in deference to the earnest appeal made to us to affirm this conviction without regard to errors. This we might do, and would do, if we could conscientiously declare that these errors were not vital. But who shall say that the admission of evidence as to the threat, and the refusal of charges going to the very essence of the defense, were not most potential in producing the result? · We administer the law of the land with equal hand between the state and the prisoner at the bar. We know nothing of his guilt or innocence, except as manifested to us by the record. Neither the tumult of popular feeling against a defendant, nor sympathy of those dear to him in his behalf, can communicate itself to this tribunal. We would be unworthy of the high places we hold, if, convinced that vital error had been committed—error showing that a fair and impartial trial has not been had—we did not unhesitatingly reverse the judgment, in order that the defendant, however guilty, when finally sentenced to death, after having had a trial fair and impartial, may not be able, dying, to charge the administration of justice with an execution unsanctioned by the law of the land.

*Reversed and remanded.*