## WADE D. STEVENS

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed June 23, 1905.*

1. CRIMINAL LAW—*great latitude is allowed in cross-examining an "approver."* In cross-examining a witness jointly indicted with the accused, and who, in testifying for the People after having been granted a separate trial, establishes his own guilt and implicates the accused, great latitude should be allowed; and it is error for the court to refuse to permit inquiry as to whether or not he expected if he testified for the People he would be more lightly punished than if he did not.

2. SAME—*physician cannot base his conclusions on a patient's history of the case.* In a trial for producing an abortion, causing death, a physician who testifies in the case cannot base his conclusion that the deceased had been pregnant prior to his examination of her but was not then pregnant, upon the history of the case as detailed by her and not upon the result of his examination.

3. SAME—*when instruction as to credibility of witness should not be refused.* An instruction in a criminal case which states the

215—38

correct rule as to impeachment of a witness should not be refused because it singles out a particular witness and directs the attention of the jury to his testimony, where he was the only witness sought to be impeached and there is no other instruction given which fairly supplies its place.

WRIT OF ERROR to the Circuit Court of Lee county; the Hon. R. S. FARRAND, Judge, presiding.

WILLIAM H. WINN, for plaintiff in error.

WILLIAM H. STEAD, Attorney General, for the People.

Mr. JUSTICE RICKS delivered the opinion of the court:

Plaintiff in error was convicted of the crime of abortion, in the circuit court of Lee county. The indictment was drawn under section 3 of the Criminal Code, and charged that plaintiff in error and one Clyde A. Grove, on April 5, 1904, by the use of instruments and medicines, caused one Alma Barnhard, a woman then pregnant with child, to abort and miscarry, when the producing of said abortion or miscarriage was not necessary for the preservation of her life, and that the death of the said Alma Barnhard resulted therefrom. The indictment included the charges of murder, manslaughter and abortion, and was very similar in form to that in the case of *Howard* v. *People,* 185 Ill. 552. Plaintiff in error was put upon his trial upon the charge of murder under said indictment, and the jury, by their verdict, found him guilty of abortion. Motion for a new trial was made and overruled and exception preserved.

As the facts relied on to sustain the judgment will appear from the evidence of the witness Clyde A. Grove, which will follow somewhat at length, and from the testimony of other witnesses and necessary comment, we deem it unnecessary to enter into a formal statement of them. ·

The witness Clyde A. Grove was jointly indicted with plaintiff in error for the offense of which plaintiff in error stands convicted. On the motion of the said Grove he was

awarded a separate trial. The ground of his motion is not shown by the record nor does it appear that it was opposed. The record merely shows the motion was made, considered and allowed. He was introduced by the People as a witness, and his was the only testimony tending in any degree to connect plaintiff in error with the crime. He testified that before deceased attained her legal majority he kept company with her and had illicit relations with her; that her father objected to his keeping company with her or visiting her at his home; that they lived close to each other and knew each other from childhood; that up to the day she was eighteen years old she lived at home with her father; that her mother was dead, and that on the day she attained her majority she left her home in order that she might keep company with him; that she went to a Mr. Johnson's and worked a few weeks, then to a Mr. Herman's and remained about three weeks, then to the home of the father of Grove and stayed a few days, and then to his sister's, a Mrs. Byrd, where she remained till her death; that he continuously had illicit intercourse with her and part of the time occupied the same room with her at his sister's; that she became pregnant between January 17 and February 17, 1904; that about March 1, 1904, he went to plaintiff in error and told him he had gotten a lady friend in a family way and asked him if he could help him; that plaintiff in error said he guessed he could, and gave him some tablets with directions as to their use, and that he took them to Miss Barnhard and she used them as directed; that they did no good; that he saw plaintiff in error a week later and told him the medicine did no good, and was given a liquid with directions, and that he gave it to Miss Barnhard, but she put it away and did not take it; that at the time plaintiff in error gave him the last medicine he told the witness that if the medicine failed he could do the work in another manner and guarantee it; that he would place something in the neck of the womb that would cause an enlargement and cause her to miscarry, but

that she would have to come to his office to be treated; that
the witness then disclosed to the doctor the identity of the
woman and said he did not know whether she would come
or not; that no time was set; that on the night of April 5,
between eleven and twelve o'clock, without any other notice
or arrangement, he took Miss Barnhard to the office of plain-
tiff in error and found him there; that little was said, and
that when the doctor took Miss Barnhard to the back room
she requested that witness be present, and that in his pres-
ence the doctor performed the operation by taking a pair of
tweezers or pincers and inserting something into the womb
of Miss Barnhard; that witness could not tell the name of
the thing inserted, although the doctor at the time of the op-
eration showed it to him and told him its name. The witness
while on the stand was shown something which he identified
as similar to what was inserted by the doctor. Witness said
he took Miss Barnhard to town in a buggy, which he left
some distance from the doctor's office, and that he and Miss
Barnhard walked to the office and saw no one on the street;
that after the operation he went and got the buggy, drove
up in front of the office and took the lady in and took her
back to Mrs. Byrd's; that on the 7th day of April, 1904,
Miss Barnhard miscarried and that there was a great deal of
flooding; that Mrs. Byrd was away from home and that he
attended Miss Barnhard; that on the 10th of April Miss
Barnhard became ill, and on the 11th she was so bad that he
went for Dr. Stevens and took him out to her, and that the
doctor went in and treated her and was to return the next
day at noon; that in the meantime the sisters of Miss Barn-
hard visited her, and one of them called Dr. Chandler, who
arrived on the 12th, before noon, and awaited Dr. Stevens'
arrival before he did anything, and that from that time on
both doctors treated Miss Barnhard till her death, which oc-
curred on the evening of April 14; that when Dr. Chandler
first came witness told him that he suspected Miss Barnhard
was in trouble.

Plaintiff in error testified in his own behalf, and denied that he ever treated Miss Barnhard before the night of the 11th of April, when taken to her by the witness Grove; denied that he ever gave her medicine or gave witness medicine for her; denied that she and the witness were in his office on the night of April 5 or at any other time, or that he ever operated on her to cause her to miscarry or cause her to abort, or that he did cause her to miscarry or abort.

The witness Grove was not corroborated in any part of his evidence or in regard to any facts detailed by him tending to connect plaintiff in error with the case in any manner prior to April 11, and there is no evidence in the record tending to show that any wrong was done on that day or any day thereafter. The office of plaintiff in error was in the business part of the town of Paw Paw, on the second floor of a business building fronting south on the main street. The stairs leading to his office were used in common by the occupants of that and the adjoining building, and on the second floor of the adjoining building was a laundry conducted by a Mr. Michels. This laundry was open every evening and very frequently until after midnight, as it was a sort of meeting place for a number of friends of Mr. Michels, where the evenings would be spent in social games and conversation. Directly opposite the door that entered the office of Dr. Stevens was a window in the laundry. The buildings were about four feet apart,—the width of the stairway.

An *alibi* is claimed by Dr. Stevens, and is supported by the evidence of Alfred E. Michels, the owner of the laundry; Harry Farver, a farmer living in Paw Paw; Ralph Douglass, a laborer, and J. B. Daugherty, a dentist. These witnesses all testify that on the evening of the 5th of April Dr. Stevens, plaintiff in error, Dr. Daugherty, Dr. Brogan, a traveling oculist, Ralph Douglass and Mr. Michels were all at the laundry of Mr. Michels and that plaintiff in error was playing cards; that all of said witnesses and parties present, except Dr. Daugherty, who had called there for the

purpose of seeing Dr. Brogan professionally, were playing cards. Farver was there from about seven o'clock in the evening until about ten o'clock. Daugherty was there from nine o'clock until after eleven, and the others were there until after midnight or later, and testified that plaintiff in error was there playing cards and engaged with them from early in the evening until after midnight. Michels and Douglass testify that shortly after midnight the party broke up and those composing it started home about the same time. The time was fixed definitely by one witness as being the evening of the annual town meeting or township election. By another as being the third day before the death of a Mrs. Potter, whom the evidence unquestionably showed plaintiff in error was attending on the nights of the 6th and 7th and where he remained all night each night. Mrs. Byrd, a sister of the witness Grove, at whose house the witness and Miss Barnhard were staying, testified in her direct examination that on the evening of April 5 Miss Barnhard and Grove were not away from home, but upon cross-examination by the People she testified that it was possible for them to have gone away and she not know about it.

The witness Grove testified before the coroner's jury that he was never married and never lived with any woman as his wife. On the trial of the cause, on cross-examination, he stated that he was married to a woman in South Dakota and lived with her, but that although they lived together they did not claim to be husband and wife and that he had been since divorced from her. He was shown to have made many contradictory statements following the death of Miss Barnhard, and four or five witnesses testified that his reputation in the neighborhood where he resided for truth was bad and that they would not believe him on oath in a matter where he was interested.

Upon cross-examination Grove was asked, "If Dr. Stevens is convicted do you expect to be further prosecuted?" Counsel for the People objected, and the objection was sus-.

tained and plaintiff in error excepted. The witness then stated that his attorney was E. H. Brewster, and that he had a conversation with him in which Brewster had advised him to tell the truth straight through. Witness was then asked, "As a result of this conversation, or any conversation you may have had with any one, do you expect to be no further prosecuted in this matter under the indictment for murder?" Objection to this question was sustained and exception saved. He was further asked if he had any conversation with any person as a result of which he expected if he took the witness stand he would be more lightly punished than if he did not, and was further asked if he had any conversation with any of his relations and friends as a result of which he had taken the witness stand with the expectation that he would either be no further prosecuted or that his punishment would be lightened thereby. To those questions objections were also sustained and exceptions saved. The court in his ruling said: "I want the record to show that the court does not hold that you cannot show that this witness has had promises or talks, or anything of that kind, with anybody in authority. You may show that." And further said: "I think it is only fair to say to you that this witness might have expectations and yet have nothing upon which to base them. I think the court should know, and the record ought to show, upon what he bases the expectations; and that you may show."

We are of the opinion that the ruling of the court upon this matter was error. The important question upon that phase of the case was the condition of the mind of the witness. The indictment was still standing against him. He had not been tried nor had a *nolle* been entered. The promise of the State's attorney to not prosecute the case or to see that his punishment was light if he became a witness and testified satisfactorily to the State was not binding upon the State. Counsel for the witness would doubtless so have told him if inquired of in relation to it. But the question is, what

operated upon the mind of the witness? Did he have hope or expectation that from the manner in which he testified and the substance of his evidence he would be favored in the case pending against himself? If he had such hope or expectation the jury were entitled to know it, so that they might determine whether, considering that fact together with all other facts appearing that might affect the credibility of the witness, they should give full faith and credit to his statement. If the witness answered that he did have hope and expectation of relief from further prosecution or of lighter punishment because of testifying, it would then be competent for the defendant or the People to show upon what it was founded. The story of the life of the witness as it appeared from the evidence was such as to stamp him as a man of a low sense of moral responsibility, whose personal fears in the presence of impending danger might, upon slight hope or expectation of relief, lead him to great length. The ruling of the court seems to have proceeded upon the theory that such a promise from a source other than those in authority would not be sufficient, and while it might not be sufficient to bind the authorities it might be sufficient to materially act upon the mind of the witness, and the state of his mind and the probable influence that state of mind had upon his evidence is vital to the weight and consideration to be given to his testimony.

For many years the law seemed settled that such a witness could not testify when an indictment was pending against him, and it was customary to either not indict him or to enter a *nolle,* so that he might testify without the stigma of not alone the indictment, but of what seems to us a natural presumption that one who was guilty, as this witness has shown himself to be, would not become a witness and detail his own crime to aid the State in convicting a fellow-criminal, without hope or promise of benefit. This witness falls within what was known at the common law as an "approver," which is defined as one charged with a felony

who confesses the fact before plea pleaded, and appeals, or accuses others as his accomplices in the same crime in order to obtain his own pardon.   For many years such witnesses were prohibited by the statute of this State from testifying. (*Gray* v. *People,* 26 Ill. 344.)  More recently the courts have come to recognize the public necessity of admitting such evidence in order that criminals may be brought to justice or crimes punished.   This public necessity cannot, however, be permitted to override the rights of the accused person to a fair trial according to the rules of law, and although an accomplice is permitted to testify, and the jury are authorized, where they feel warranted in doing so, in convicting upon the uncorroborated testimony of such a witness, it is and has been the long recognized rule that the court should allow great latitude in the cross-examination of such a witness, and is warranted in directing the jury to carefully scrutinize such evidence, and that they may, if they think the circumstances justify it, refuse to convict upon it unless corroborated.   Similar views to those we have expressed have been held in other States and the rule contended for by plaintiff in error has been applied.   (*People* v. *Christy,* 65 Hun, 349; *Allen* v. *State,* 10 Ohio St. 287;  *People* v. *Langtree,* 64 Cal. 256;  *State* v. *Kent,* 62 N. W. Rep. 631;  *People* v. *Hare,* 24 id. 843.)  In *State* v. *Kent, supra,* an accomplice was asked whether he expected to be hung for his crime.   The objection was sustained, and the Supreme Court held that it was error, and very fully and ably discussed the question.

Mrs. Byrd testified that she had charge of the laundry of her household, of which Miss Barnhard was a member, and that she at no time saw any traces of blood or marring of the bed linen.   Plaintiff in error and Dr. Chandler both testified that they made bi-manual examinations of the uterus of Miss Barnhard,—one upon the 11th and the other upon the 12th day of April; that there was no blood, bloody discharge or discernible odor, and that from the physical examination, not connected with the history of the case as

given by the patient, they were unable to say that there had been either pregnancy or miscarriage. Dr. Chandler, while testifying, stated that an ordinary course pursued by physicians was to talk with the patient and get the history of the case and then make a physical examination, and from both determine the condition. Counsel for plaintiff in error objected to the statement of any conclusion reached by the witness from what was said by the patient, but did not object to any conclusion reached from the objective or physical examination. The court overruled the objection and allowed the witness to state what his conclusion was as derived from the history of the case and the examination, upon which the doctor stated that he had concluded that the patient had been pregnant but that she was not then pregnant. Following this examination the witness said that from his objective examination he did not reach an opinion as to the cause of her then sickness. Objections were interposed to the questions calling for answers based upon the statement or information derived from the patient, which were overruled and exceptions taken. When the last answer was given, a motion was made to exclude the evidence of the witness, which was also overruled and exception saved.

While it is competent to show exclamations indicating pain as being some evidence of pain itself and to show where the patient locates the seat of his or her suffering, we know of no well considered case where it is held competent for the physician to testify that he reached his conclusion or formed his opinion as to the ailment or physical condition of the patient from the cause or history of the injury, ailment or disease as narrated by the patient. Among the material questions being considered were whether Miss Barnhard had been pregnant, and whether she had miscarried or aborted of medicines administered or through mechanical means used. She was not a party to the proceedings, nor were her statements offered in the form of dying declarations or to serve the purpose of such, and they amounted to no more

than hearsay evidence between the patient and her physician, and were not part of the *res gestæ.* The objection should have been sustained. *People* v. *Murphy,* 101 N. Y. 126; *Howard* v. *People, supra; Hayes* v. *State,* 40 Md. 635.

It is also complained that the thirty-fifth instruction offered by the plaintiff in error was refused. This instruction was upon the credibility of the witness. It first stated a correct rule as to impeachment, and then proceeded as follows: "And in this case, if the jury believe, from the evidence, that the witness Clyde Grove has been successfully impeached by reason of bad reputation for truth and veracity or by reason of statements made out of court conflicting with statements made by him on the witness stand in this case, they will be justified in disregarding his entire testimony, except in so far as he has been corroborated by other credible evidence or by facts and circumstances proved on the trial." Counsel for the People say that this instruction was properly refused because it pointed out the witness Clyde Grove. Ordinarily this is a vice that will justify a refusal of the instruction. In the case at bar, however, Clyde Grove was the only witness whose evidence was sought to be impeached. He is the only witness whose reputation for truth and veracity was attacked and the only one who was shown to have made conflicting statements before the trial with those made at the trial. It had no application to any other witness. (*Owens* v. *State,* 80 Miss. 499; *Hoyt* v. *People,* 140 Ill. 588.) No instruction fairly supplied or took its place, and we are of the opinion it should have been given.

For the purpose of determining the questions arising upon objections to evidence and the instructions in the cause we have felt called upon to review to some extent the evidence. What is said in this opinion upon the evidence is not to be regarded as an expression of the court upon the merits of the case.

For the above reasons the judgment will be reversed and the cause remanded.        *Reversed and remanded.*