SANDROFF v. UNITED STATES.

THOMAS PAPER STOCK CO. v. SAME.

Nos. 10051, 10052.

Circuit Court of Appeals, Sixth Circuit.

Dec. 10, 1946.

Homer Cummings, of Washington, D. C. (E. Cyril Bevan, of Detroit, Mich., and Jack H. Oppenheim, of Chicago, Ill., on the brief), for appellants.

Helen M. Bloedorn and Samuel Rosenwein, both of Washington, D. C. (John C. Lehr and Francis X. Norris, both of Detroit, Mich., and David London and Albert Dreyer, both of Washington, D. C., on the brief), for appellee.

Before HICKS, ALLEN and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

Alvin E. Sandroff and the Thomas Paper Stock Company, a corporation of which he was president, have appealed from judgments of conviction on the verdict of a jury and from sentences of imprisonment for two years and a fine of $10,000 imposed upon the individual appellant, and a fine of $10,000 imposed upon the corporation. The indictment upon which conviction rested charged the appellants and three other persons who were not indicted, namely, Charles Ginns, his son Jack Ginns, Jacob Moss, and other persons unknown, with an unlawful conspiracy to violate paragraph (b) of Section 205 of the Emergency Price Control Act of 1942, as amended, Public Laws 421 and 729 of the 77th Congress, 50 U.S.C.A.Appendix, § 925(b), and Section 1347.10 of Maximum Price Regulation No. 30 as amended (7 Fed. Register 9732; 8 Fed. Register 3845, 6109, 7199, 8350), issued by the Price Administrator of the

Office of Price Administration, pursuant to lawful authority vested in him by the Emergency Price Control Act, as amended, and by Executive Order No. 9250, 50 U.S.C.A. Appendix, § 901 note, issued by the President of the United States.

The statute involved, Section 37 of the Criminal Code, 18 U.S.C.A. § 88, provides that if two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both.

The Emergency Price Control Act of 1942, as amended, authorizes the Price Administrator to issue such regulations, orders and requirements as he deems necessary to prevent the circumvention or evasion of the Act. In broad terms, it was made unlawful for anyone to violate regulations or orders promulgated by the Administrator. Section 205(b) of the Act provides, inter alia, that any person who makes any statement or entry false in any material respect in any document or report required to be kept or filed under Section 202 of the Act, 50 U.S.C.A.Appendix, § 922 shall be subject to stated fine and imprisonment.

The Maximum Price Regulation, No. 30, referred to in the indictment, requires (Section 1347.10) that "every person making purchases or sales of commercially packed wastepaper shall keep for inspection by the Office of Price Administration for so long as the Emergency Price Control Act of 1942 shall remain in effect, complete and accurate records of each purchase or sale of wastepaper", showing the date of purchase or sale, the name and address of the buyer or seller, the grade of waste paper purchased or sold, the quantity of each grade purchased or sold, and the price paid or received.

The indictment charged that the appellants and their unindicted coconspirators had unlawfully conspired to make and keep false, inaccurate and incomplete records "of proposed waste paper sales by co-conspirators Charles Ginns, Jacob Moss and Jack Ginns to defendants Alvin E. Sandroff and Thomas Paper Stock Company, a corporation".

Scienter of Section 1347.10 of Maximum Price Regulation No. 30 was charged to the defendants and their named coconspirators; and it was averred that the purpose of the conspirators was that the two Ginns and Moss might obtain, and Sandroff and Thomas Paper Stock Company might pay, a price for waste paper in excess of that permissible under the Emergency Price Control Act, as amended. Among the 19 overt acts alleged were shipments of carloads of "waste paper" from Detroit, Michigan, to Chicago, Illinois, by Charles Ginns to appellants; various specified advance payments, or payments caused to be made, "for waste paper to be sold" to the appellant corporation by the coconspirators, Moss and the Ginns, father and son; and cash payments to Jack Ginns by Derdiger, a bookkeeper for the appellants.

■ (1) There was no error in the denial by the trial judge of the motion to quash the indictment. Appellants' argument upon the point is that the indictment is fatally defective, in that the object of the conspiracy is alleged to have been the keeping of false, inaccurate and incomplete records of "proposed waste paper sales", when the pertinent statute and regulations do not require the keeping of records of *proposed sales,* or the keeping of records of sales of paper other than *commercially packed waste paper.* We think the indictment was sufficiently well drawn to embrace the essential elements of the conspiracy charged; to apprise adequately the defendants of the charges required to be met; and to place them in position, after trial, to plead *autrefois convict* or *autrefois acquit.*

Here, the test of the sufficiency of the indictment was quite as well met as it was in Bogy v. United States, 6 Cir., 96 F.2d 734, 736. See Williams v. United States, 6 Cir., 3 F.2d 933, 934, in which it was held that a motion to quash an indictment for conspiracy to violate the National Prohibition Act, 27 U.S.C.A. § 1 et seq., was properly overruled. The language of Judge Knappen in that case seems applicable in this one: "The gist of the offense charged

is conspiracy. The indictment is not so vague and indefinite in its statement of facts as not to enable defendants intelligently to prepare their defense, or to have protection against further prosecutions. It is the general rule that an indictment charging conspiracy is sufficient, if it follows the language of the statute and contains a sufficient statement of an overt act to effect the object of the conspiracy. [Citing authorities]."

In Williamson v. United States, 207 U.S. 425, 447, 449, 28 S.Ct. 163, 171, 52 L.Ed. 278, Mr. Justice White (later Chief Justice) declared that where a conspiracy is charged, "the conspiracy is the gist of the crime, and certainty, to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is requisite in stating the object of the conspiracy." Accordingly, assignments of error assailing the sufficiency of the indictment were held to be without merit. Citing the Williamson case. and other authorities, Chief Justice Taft declared, in Thornton v. United States, 271 U.S. 414, 423, 46 S.Ct. 585, 588, 170 L.Ed. 1013, that the "rules of criminal pleading do not require the same degree of detail in an indictment for conspiracy in stating the object of the conspiracy as if it were one charging the substantive offense." See also Wong Tai v. United States, 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545.

■ (2) Appellants insist that their motion for a directed verdict at the close of all the evidence should have been granted, and assert that there was no evidence introduced showing that there was a conspiracy to keep false records with respect to "commercially packed wastepaper" or with respect to any "document or report" required to be kept or filed. They say that the proof failed to bring them within the scope of Section 205(b) of the Emergency Price Control Act, penalizing "any person who willfully violates any provision of Section 4", or "who makes any statement or false entry in any material respect in any document or report required to be kept or filed under Section 2 or Section 202"; and that Section 1347.10 of Maximum Price Regulation No. 30, as amended, requires only persons making purchases or sales of *commercially packed waste paper* to make and keep complete and accurate records of prices paid or received on purchases or sales.

As authority for the proposition that the regulation in issue should be given no broader scope than its language requires, appellants point to the opinion of Mr. Justice Murphy in M. Kraus & Bros. Inc. v. United States, 66 S.Ct. 705, 708, 90 L.Ed. —, decided March 25, 1946. In that case, the opinion writer for the majority of the court asserted that the same strict rule of construction must be applied to regulations of the Price Administrator as to criminal statutes; that courts must be careful not to construe so strictly as to defeat the obvious intention of the Administrator; that words used by him to describe evasive action must be given their natural and plain meaning, supplemented by his contemporaneous or long-standing interpretation; and that "prohibited conduct must, for criminal purposes, be set forth with clarity in the regulations and orders which he is authorized by Congress to promulgate under the Act."

In reply, the Government maintains that the record reveals that the conspirators, including the appellant Sandroff, agreed to falsify the records pertaining to *all waste paper sales* and that Sandroff clearly knew, understood and agreed that the records of *commercially packed waste paper* would be falsified, "because every shipment of wastepaper which he received without protest was baled and invoiced at the price for commercially packed paper."

This brings us to a discussion of the facts of the case. Sandroff had been in the waste paper business for 25 years. He was president of the Thomas Paper Stock Company, which had its main office in Chicago and did business as purchaser and seller of waste paper in several states, including Michigan. Charles Ginns, with some 11 years' experience in the waste paper business, was in partnership with Jacob Moss at Detroit, Michigan, under the firm name of Central Waste Material Company. Jack Ginns, son of Charles, was engaged in buying waste paper on his own account and handled his transactions through his father's firm.

Charles Ginns was the first and chief witness for the Government in the prosecution of Sandroff and the Thomas Paper Stock Company. He testified that he and his son, Jack, went to Chicago to see Sandroff in response to a telephone call received on or about October 5, 1943; that, in the telephone conversation, Sandroff had told him that it would be worth his while to come to Chicago, because Sandroff knew that "a lot of people in Detroit were getting above the ceiling prices"; and that Ginns could "make a good deal". According to the witness, when he saw Sandroff in his private office in Chicago he was told that, inasmuch as 98% of the trade was getting above the ceiling price, Sandroff did not see why Ginns should not do so; and that he would pay Ginns $10 for corrugated and $6 for news, above the ceiling. Asked whether there was any conversation as to how the sales should be handled, Charles Ginns answered: "I think I should send him in some invoices with the ceiling price at so much cost, and during the week I should come down there [to Chicago] and he will pay me the balance in cash." He received from Sandroff $1,000 on account.

Becoming dissatified, because Crane, a representative of Sandroff, had come to Detroit to buy paper from all dealers, the elder Ginns, accompanied by his son, again went to Chicago to see Sandroff in his private office and was assured that Crane would be kept out of Detroit, and that Sandroff would continue to buy paper from him at the same figures above the ceiling price and would buy even 200 or 300 cars a day. During this interview, Sandroff called in the secretary of appellant corporation, Mrs. McGregor, and told her that she should make out a purchasing order for a number of carloads which Ginns had sold him at that time; and that, in his absence, she should take care of "the balance of the money above the ceiling." Sandroff then paid Ginns $2,000 on account. About a week later, according to Charles Ginns, his son went to Chicago and returned with a check from the Thomas Paper Stock Company covering the balance due on invoices, a check for $2,000 as advance payment, and about $1,100 in cash for the amount due above the ceiling price.

Charles Ginns testified further that, on November 1, 1943, he made another trip to Chicago to discuss the money which Sandroff owed him. The latter called in his bookkeeper, who calculated the amounts due; whereupon Ginns was given one check covering invoice prices and another for additional prices above the ceiling. He cashed the illegitimate check and placed the proceeds in his safe in an envelope.

Asked at the outset of his examination what he did with purchased waste papers, Charles Ginns answered: "We pack them, we bale them up. We buy them from everybody, housewives, and from peddlers, and take them to the yard, and take them off the truck and put them in the baler and bale them up, and sell them to brokers, and sometimes we ship directly to the mills." On cross-examination, he adhered to his direct testimony, saying that he purchased paper from peddlers in the form in which picked up by them in pushcarts, or wagons, or some sort of conveyance at residences, down-town buildings, or elsewhere, and then baled the paper into classifications for the purpose of re-sale.

Jack Ginns corroborated his father on the material details of what occurred on the two trips to Chicago which they made together. The younger Ginns added, however, that, during the second conversation, Sandroff had suggested that the Ginns should get some cars, park them on the track, and let paper be taken "right off" from the peddlers' wagons and shipped direct to the Thomas Paper Stock Company, inasmuch as the mills would take the paper that way. His answers on cross-examination are somewhat beclouded. Asked if Mr. Sandroff encouraged him to buy newspaper and "put it right in the cars from the junkies" or the individuals from whom he bought, he answered, "Yes." Queried as to whether he had done so, he replied, "Well, no." In reply to the question whether he packed any newspaper at all, he said: "Not that I recall of any." It is not an unreasonable inference from his testimony that Jack Ginns did not follow Sandroff's suggestion to buy and ship loose newspaper; and that, when he stated that he did not recall packing any newspaper, he meant that he did not remember shipping

*any newspaper,* for his father had testified that *90 percent of the shipments to Sandroff consisted of corrugated paper,* and only 10 percent of *newspaper.*

From further testimony of Jack Ginns, it appears that on his October 18 trip to Chicago, he handed Mrs. McGregor a piece of scratch paper on which was calculated how much paper had been shipped to the Thomas Paper Stock Company and how much money his father's firm was entitled to receive in cash for payment of over-ceiling prices on the agreed basis. After having him wait awhile, Mrs. McGregor gave him a statement listing the number of all invoices of shipments made, their dates and the amounts due on each. She then gave him two checks: one for $74.27 covering the balance due; the other for $2,000, on account. Mrs. McGregor told him that he would be driven down town to a bank and given additional money. Bert Derdiger motored him down town; and, leaving him outside, entered a bank and came out with around $1,100 in cash, which he gave to the younger Ginns. He testified that the same procedure was followed on a later trip made by him to Chicago. Bert Derdiger, bookkeeper in charge of the office records of the Thomas Paper Stock Company, called as a Government witness, corroborated the testimony of Jack Ginns concerning the payments.

Eighty-eight exhibits were received in evidence, whereof the first 85 are a purchase order, invoices, statements and bills of lading pertaining to the transactions between the Central Waste Material Company partnership and the appellant Thomas Paper Stock Company. The other three exhibits were, respectively, an "invoice" showing miscellaneous income which Charles Ginns testified was a record of money realized from over-ceiling transactions; an accounts receivable statement made by Max J. Tepper, bookkeeper for the Central Waste Material Company, showing transactions between the two concerns; and the file in a civil action brought in the United States District Court for Eastern Michigan by Chester Bowles, Adm'r of O.P.A., against Charles Ginns and Jacob Moss, individually and as copartners under the firm name of Central Waste Material Company.

It is important to observe that the shipping memoranda, or invoices, from the Central Waste Material Company to Thomas Paper Stock Company, while listing only "unit weight" and with no entry under "bales", were for the ceiling price for *baled paper.*

Testifying in his own behalf, Alvin E. Sandroff said that on October 4 or 5, 1943, he telephoned from Chicago to Charles Ginns in Detroit and told him that his company was in urgent need of paper, and asked Ginns if he could supply some waste paper. The appellant's version was that Ginns replied that he was receiving $6 and $10, respectively, over the ceiling prices for newspaper and for corrugated paper; and that, if Sandroff could meet these figures, he would come to Chicago. The witness said that he told him to "come ahead". When Ginns arrived, he renewed his offer and Sandroff admitted that he agreed to purchase paper from him at the specified over-ceiling prices, but denied that there was any discussion at that time as to how Ginns, or anybody else, should keep his records in connection with the sale and purchase of waste paper.

From the evidence in the case, it is deducible that Ginns' regular manner of handling waste paper was to put the material into a "baler", that is, a machine for compressing paper into bales; that Sandroff knew how Ginns handled his paper; that all the invoices were, as a matter of fact, for ceiling prices for *commercially packed waste paper;* and that Sandroff, having knowledge of this fact, made the over-ceiling payments. All this would seem to bring the transactions within the regulations pertaining to "commercially packed wastepaper". From the foregoing review of the testimony, it would appear also that a reasonable inference can be drawn from all the circumstances of the case that Sandroff had guilty knowledge of the falsification of the records of transactions between his company and Ginns' Detroit firm. There was, therefore, substantial evidence upon which to submit the issues of fact to the jury. The district court committed no

628

error in denying the motion of appellants for a directed verdict.

(3) We come now to the crucial issue presented on this appeal. Charles Ginns, who had been named in the indictment as a coconspirator but had not been included as a defendant therein, was asked on cross-examination: "When were you offered immunity as to this indictment?" The United States Attorney objected to the question, and the court sustained his objection. The cross-examiner immediately asked: "Were you offered immunity in this case?" The witness replied, "No".

"You say that notwithstanding the fact you were not named as a defendant in the indictment?" Again the United States Attorney objected. The trial judge stated that, while he was not sure, he thought that immunity could not be offered under Federal law, but knew that it could be under state law. He added: "I can say this, in my 14 years' experience in this court, it never has occurred."

The attorney for the defense insisted that the witness had not been indicted in the case, and that he sought to find out "for what reason and under what circumstances" he had not been indicted.

Then ensued the following colloquy.

The Court: "That is not competent or material anyway."

Mr. Bevan [defense attorney]: "It is competent and material to this extent—".

The Court [interposing]: "The only investigation before this court and jury is whether these men and this company and the co-conspirators were guilty, of conspiracy. Why this man was not made a defendant is none of our business, none of our affairs, nor will we inquire into it."

Mr. Bevan: "If the court please, it would bear upon this man's motive, if any, to testify."

The Court: "It is incompetent and irrelevant and wholly foreign to the issues in this case."

Mr. Bevan: "I wish to tender such proof, your Honor, and I will proceed."

Later, during the trial, the attorney for defendants noted exceptions to certain of the Judge's observations which had been heard by the jury, and moved that the jury be instructed to disregard the statements, including the remark that in the Judge's 14 years' experience no promise of immunity had ever occurred. The Court closed the discussion concerning immunity, by saying: "There isn't any evidence at all that it has been done in this case, and we will give that no consideration." The remark to which exception had been taken was not withdrawn.

During the cross-examination of Jack Ginns, he was asked whether he had been called upon to pay, or whether he had paid, any damages arising out of his transactions with the Thomas Paper Stock Company. Stating that the only way in which such matters might come in would be on a question of credibility, the Court, nevertheless, sustained the objection to that line of questioning, asserting: "There is not any such thing as consideration, as any immunity for these people." The defense attorney pressed the point that whether or not the coconspirators had been sued "may and does involve immunity, in that the statute of limitations has run." The Court ruled: "It cannot have anything whatever to do with it. It is not a part of this case, and we will go into that in no degree."

After the Government had rested upon its proof, the defense attorney asked leave to cross-examine Charles Ginns "relating to the reasons, if any, for the failure to indict him as bearing upon the witness' credibility, and as bearing upon his interest in the outcome of this case, and his interest in the entire subject matter." The attorney made it clear that he sought further to show by cross-examination of Charles Ginns that the one-year statute of limitation had been allowed to run against the collection by the Government of many thousands of dollars, for which Ginns and his partner were liable as borne out by the complaint in the civil action exhibited and made part of the record in the cause. It was argued that such matters bore upon the credibility of vitally interested witnesses, Charles and Jack Ginns. The Court ruled that the tendered cross-examination would not be permitted. Counsel for defendants then moved for a mistrial. The motion was overruled.

■ In our judgment, the district court committed reversible error: in the first instance, in shutting off the cross-examination of Charles Ginns upon the question of promised or expected immunity; and, later, in refusing to permit his cross-examination upon the tendered subject matter pertaining to why he and his son, Jack Ginns, who, though named as coconspirators *in pari delicto* with Sandroff, had not been included as defendants in the indictment. The two Ginns were the chief and indispensable Government witnesses in the prosecution of Sandroff and his company. In such circumstances, it was highly important that latitude be allowed in cross-examination to test their motives for testifying against Sandroff as bearing directly upon their credibility. The district court emphasized its error by declaring in the presence of the jury that it was incompetent, irrelevant and wholly foreign to the issues in the case to show why Charles Ginns had not been included as a defendant in the indictment.

The decision and opinion of this court in Farkas v. United States, 6 Cir., 2 F.2d 644, 647, is directly in point, and clearly indicates that the judgment below must be reversed and the case remanded for re-trial. The necessity for this course is apparent from the following quotation from the opinion: "The prosecuting witnesses, before the time of the trial, had pleaded guilty to an indictment in the federal court; the verdict of guilt or innocence in the instant case depended primarily upon their credibility as against that of defendant who testified in denial of the damands and threats. *As bearing upon their credibility, motive for false accusations, as well as bias, was vitally relevant, and testimony tending to show such motive was entirely competent. Concededly promises of immunity are admissible; they are, however, rarely made.* Inasmuch as the question involved is the motive for testifying falsely and therefore the state of mind of the prosecuting witnesses, the relevant evidence is not alone the acts or attitude of the district attorney but anything else that would throw light upon the prosecuting witnesses' state of mind. *It is therefore entirely proper, either by cross-examination of the witness himself, or otherwise, to show a belief or even only a hope on his part that he will secure immunity or a lighter sentence, or any other favorable treatment, in return for his testimony, and that, too, even if it be fully conceded that he had not the slightest basis from any act or word of the district attorney for such a belief or hope.* The fact that despite a plea of guilty long since entered, the witness had not yet been sentenced, is proper evidence tending to show the existence of such hope or belief.

"The trial judge, although at one time during the taking of testimony he had so ruled, later sustained the objection to similar testimony, and finally not only refused an instruction that the jury might consider the fact of the delayed sentence as bearing on such hope, but expressly instructed counsel that they must not argue the matter as affecting the motives of the witnesses.

*"In our judgment, this was such error as to compel a reversal* in the instant case. Stevens v. People, 215 Ill. [593,] 601, 74 N.E. 786; State v. Kent, 4 N.D. 577, 62 N.W. 631, 27 L.R.A. 686." [Italics supplied.]

In Alford v. United States, 282 U.S. 687, 692, 693, 694, 51 S.Ct. 218, 219, 75 L.Ed. 624, the Supreme Court held that the defense had the right to show by cross-examination that the testimony of a prosecuting witness was affected by fear, or favor growing out of his detention, and that it was immaterial whether he was in custody because of his participation in the transactions for which the defendant was indicted or for some other offense. The ruling of the trial court, cutting off *in limine* all inquiry as to whether his testimony was biased "because given under promise or expectation of immunity, or under the coercive effect of his detention by officers of the United States, which was conducting the present prosecution", was held to be an abuse of discretion and to constitute prejudicial and reversible error. Farkas v. United States, supra, was cited three times in the opinion in the Alford case. Mr. Justice Stone (afterwards Chief Justice) pointed out that it is the essence of a fair trial that reasonable latitude be given a cross-examiner, and asserted: "To say that

prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial." Cf. Moyer v. United States, 9 Cir., 78 F.2d 624, 630. See King v. United States, 5 Cir., 112 F. 988, 995, 996, for discussion of the wide latitude permitted in the cross-examination of witnesses in criminal cases. The authorities cited by Government counsel are not considered to be in conflict with the reasoning in the authorities which impel us to reverse and remand this case. Ramsey v. United States, 6 Cir., 268 F. 825; Beach v. United States, 80 U.S. App.D.C. 160, 149 F.2d 837; Safford v. United States, 2 Cir., 252 F. 471; Barron v. United States, 1 Cir., 5 F.2d 799, 804.

(4) Inasmuch as the case must be retried, it would seem appropriate to comment upon two other assignments of error. Appellants say that the trial court erred in failing to charge the jury concerning the provisions of Maximum Price Regulation No. 30, Section 1347.10, as to the records required to be kept thereunder; and in failing to properly instruct the jury as to whose records were involved. With respect to the subject matter of the assignments, however, no exception was taken to the charge; nor was any special instruction requested.

The indictment was not read to the jury, nor was there any clear statement as to what was therein charged; and nowhere in the charge did the court state or explain the pertinent provisions of the Emergency Price Control Act, or the Maximum Price Regulation which the defendants were charged with conspiring to violate. The jury was instructed only that the defendants, "together with the co-conspirators named", the Ginns and Jacob Moss, and perhaps others unknown, were charged with unlawful conspiracy "to make and keep false, inaccurate, incomplete records of proposed waste paper sales by the conspirators and the defendants." The Judge explained clearly that defendants were not charged with sales of a product above the ceiling price, but were on trial "solely and simply on a charge that they entered into an agreement with these alleged co-conspirators to make false entries, incomplete entries." Again, the jury was told that the unlawful act charged in the alleged confederacy was the improper keeping of books. The jury was instructed that if any two or more of the parties involved in the conspiracy had agreed that there should be "in the bookkeeping end of that deal a concealment, a hiding, a falsification, or any of these things that would establish that illicit bookkeeping under the statute," it would make no difference who actually "did the affirmative act", as long as a conspiracy had been established: that is, a conspiracy that "improperly and unlawfully conducted bookkeeping should be done."

While the charge of the court is commendable for its simplicity of statement, we think that, on retrial, the court should explain to the jury the pertinent provisions of the Emergency Price Control Act and, especially, should the language of the pertinent portion of Section 1347.10 of Maximum Price Regulation No. 30 be read and explained to the jury.

Another comment seems appropriate. On direct examination, Charles Ginns, was questioned concerning a conversation with Crane. He answered that Crane had told him that Sandroff was going to plead guilty "if the case [should] come up." Objection to the answer was made and sustained, but a motion for a mistrial on the ground that the answer was prejudicial to the defendant was denied; and the court instructed the jurors to disregard the answer and let it have no effect whatever upon them. Upon retrial, the court should be careful to guard against the hearing by the jury of any such statement from Charles Ginns, or from any other witness.

For the reasons heretofore stated, the judgments below are reversed; and the cases remanded to the district court for a new trial.